283 F.3d 404
 SPRINT SPECTRUM L.P. d/b/a Sprint PCS, Plaintiff-Appellee,
v.
Richard P. MILLS, individually and as Commissioner of the New York State Department of Education, Charles A. Szuberla, individually and as Coordinator, Facilities Management and Information Services of the New York State Department of Education, and Carl T. Thurnau, individually and as Acting Supervisor of the New York State Department of Education, Office of Facilities Planning, Defendants,
Board of Education of the Ossining Union Free School District, Appellant.
 Docket No. 01-7116.
 United States Court of Appeals, Second Circuit.
 Argued May 3, 2001.
 Decided March 5, 2002.
 
 COPYRIGHT MATERIAL OMITTED David L. Snyder, Tarrytown, New York (Frederick W. Turner, Snyder & Snyder, Tarrytown, New York, on the brief), for Plaintiff-Appellee.
 Lawrence W. Reich, Northport, New York (Gus Mountanos, Ingerman Smith, Northport, New York, on the brief), for Appellant.
 Before: MESKILL, KEARSE, and McLAUGHLIN, Circuit Judges.
 KEARSE, Circuit Judge.
 
 
 1
 This litigation centers on the efforts of plaintiff Sprint Spectrum L.P. ("Sprint" or "SSLP") to install a telecommunications facility, to wit, a cellular communications tower to facilitate wireless telephone communications, atop the Ossining, New York high school (the "High School"). The Board of Education of the Ossining Union Free School District ("School District" or "District"), which in 1998 entered into a lease agreement with Sprint permitting the installation of such an antenna on the High School roof, appeals from an injunction entered in the United States District Court for the Southern District of New York, Barrington D. Parker, Jr., then-District Judge, requiring the District to allow Sprint to install the antenna. Although this action began as a suit by Sprint solely against officials of the New York State Department of Education ("DOE" or the "Department") to compel the issuance of New York State ("State") permits needed for construction of the antenna in accordance with the lease agreement, see Sprint Spectrum L.P. v. Mills, 65 F.Supp.2d 148 (1999) ("Sprint I") (granting injunction against State officials), the present injunction, entered by the district court under the All Writs Act, 28 U.S.C. § 1651 (1994), prohibits the School District from interfering with Sprint's rights under the lease and under the Telecommunications Act of 1996, 47 U.S.C. § 151 et seq. ("TCA" "Telecommunications Act" or "Act"), see Sprint Spectrum L.P. v. Mills, 124 F.Supp.2d 211 (2000) ("Sprint II"). On appeal, the School District contends principally that the district court erred (a) in exercising jurisdiction over it, (b) in applying the TCA, and (c) in interpreting the lease agreement. For the reasons that follow, we conclude that the district court could properly assume jurisdiction over the School District in this matter under the All Writs Act; but we disagree with the court's interpretation of the Act, and we conclude that there are factual issues to be resolved with respect to the meaning of the lease agreement.
 
 I. BACKGROUND
 
 2
 Many of the facts are not in dispute and were discussed in Sprint I. Sprint is a provider of cellular telephone service in the New York-New Jersey area. In 1995, Sprint was the highest bidder at an auction, conducted by the Federal Communications Commission ("FCC"), for a license to broadcast wireless telephone communications in an area defined by the FCC as the New York-New Jersey Major Trading Area ("MTA"), employing personal communication service technology ("PCS"). PCS uses digital, rather than analog, transmission to improve wireless communications by, inter alia, providing clearer connections and fewer dropped calls. See Sprint I, 65 F.Supp.2d at 150.
 
 
 3
 As an FCC-licensee, Sprint is obligated to provide wireless communication service to at least 33% of the population located in an area defined by the FCC as the New York-New Jersey Major Trading Area ("MTA") within five years from the date the license was granted.... The license has a term of ten years. In order to meet its obligation under the FCC license, Sprint must create a network of individual "cell sites," which are facilities consisting of a radio antenna and attached equipment which send and receive radio signals to and from customers' portable wireless communication handsets and mobile telephones. The antenna feeds low power radio signals received from mobile phones through the attached electronic equipment and into ordinary phone lines so calls can be routed anywhere in the world.
 
 
 4
 
 Id.
 
 
 
 5
 A. The Lease Between Sprint and the School District
 
 
 6
 The MTA includes Ossining, New York. In September 1998, Sprint and the School District entered into a five-year lease agreement (the "Lease"), automatically renewable for four additional five-year terms at Sprint's option, permitting Sprint to locate a cell site on the roof of the High School. In exchange for this right to erect and maintain the antenna on the High School, Sprint was to pay the School District an annual rent of $30,000, escalating by at least three percent per year, and to provide, free of charge, three Sprint PCS wireless telephones to the School District. Sprint agreed to disguise the antenna as a flagpole, similar to the one already on the High School roof, in order that the Sprint facility be aesthetically and structurally unobtrusive. The Lease also allowed Sprint to make such periodic technological improvements at the cell site as it deemed necessary:
 
 
 7
 7. Improvements. SSLP may, at its expense, make such improvements on the Site as it deems necessary from time to time for the operation of the PCS system. Owner agrees to cooperate with SSLP with respect to obtaining any required zoning approvals for the Site and such improvements.
 
 
 8
 (Lease ¶ 7.)
 
 
 9
 In October 1998, Sprint and the School District agreed to incorporate into the Lease a one-page addendum (the "Addendum" or "Lease Addendum"), dealing with density of radio emissions from the proposed antenna in terms of the number of microwaves ("µw") per square centimeter. The Addendum stated that
 
 
 10
 it is hereby agreed that during the entire term of the agreement between Ossining Union Free School District and Sprint PCS, the following maximum levels for the proposed PCS antenna shall not exceed:
 
 
 11
 1. 6 feet above grade power density (µw/cm[2])<0.07
 
 
 12
 2. 16 above grade power density (µw/cm[2])<0.09
 
 
 13
 The foregoing operating specification applies only to the Sprint Spectrum, L.P. antenna configuration, as originally installed. The Board of Education shall have the right to test said power density at its discretion to determine the maximum power density as set forth above, using the FCC OET Bulletin 65, IEEE or NCRP approved methodology. In the event the power density should exceed the aforementioned calculations, Sprint will reimburse the district for said testing and in addition correct said power density to or below the maximums....
 
 
 14
 (Id.)
 
 
 15
 B. The Injunction in Favor of Sprint Against the State (Sprint I)
 
 
 16
 Under State regulations, because the cost of constructing the cell tower on the High School was to exceed $10,000, Sprint needed approval from DOE. The requisite application was filed in December 1998. In January 1999, DOE refused to grant the necessary permit, stating (a) that the State Constitution prohibits the School District from leasing public property to a private party if the lease primarily benefits the private party, and that the primary benefit of the Lease would accrue to the private benefit of Sprint; (b) that it was not certain that "the property... is not currently needed for school district purposes"; and (c) that the School District lacked the authority to contract with Sprint. (Letter dated January 12, 1999, from DOE to attorney for Sprint.)
 
 
 17
 Unable to resolve its conflict with DOE, Sprint commenced the present action in February 1999, naming as defendants the pertinent DOE officials. The complaint requested principally a judgment (a) declaring that DOE's refusal to grant approval for construction of the antenna violated the Telecommunications Act, and (b) ordering the defendants to issue the necessary approvals.
 
 
 18
 In Sprint I, issued on August 27, 1999, the district court ruled in favor of Sprint. First, it found that the Lease did not violate the State Constitution, noting that the State has accorded cellular telephone companies the status of public utilities, and that "Congress has expressly emphasized that providing wireless telephone services furthers an important public purpose," Sprint I, 65 F.Supp.2d at 155.
 
 
 19
 The statute creating the Federal Communications Commission directs the commission to issue wireless communications licenses,
 
 
 20
 to make available, so far as possible, to all the people of the United States, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication....
 
 
 21
 Id. (quoting 47 U.S.C. § 151). Thus, the court rejected DOE's contention that the Sprint-School District Lease was solely for the private benefit of Sprint, finding that "the lease is in furtherance of a public purpose." 65 F.Supp.2d at 155-56.
 
 
 22
 Second, the court rejected DOE's view that the School District lacked authority to enter into the Lease agreement:
 
 
 23
 Because [a] the portion of the roof that would house Sprint's cell site is not currently needed for school district purposes, [b] Sprint's cell site would serve a public purpose, and [c] the District determined that the leasing of such property is in the best interest of the District, defendants' argument that the school district lacked authority to enter into the lease has no merit.
 
 
 24
 Sprint I, 65 F.Supp.2d at 156-57.
 
 
 25
 Finally, the court found that DOE's invocation of its regulations to withhold approval violated the TCA in various ways. The Act prohibits state laws that unreasonably discriminate against particular telecommunications providers or constitute barriers to entry. See 47 U.S.C. § 332(c)(7)(B)(i) ("[t]he regulation of the placement[ or] construction ... of personal wireless service facilities by any State or local government or instrumentality thereof... shall not unreasonably discriminate among providers of functionally equivalent services"). The district court found that DOE's denial "unreasonably discriminated against Sprint" by
 
 
 26
 making it much more difficult for Sprint to compete with other wireless services. First, the Department's action serves to frustrate the primary purpose of the Act to increase competition in the telecommunications industry.... The Department's rejection of Sprint's application either denies Sprint the opportunity to compete in the licensed area, or, at the very least, significantly increases Sprint's costs by forcing it to find an alternative site....
 
 
 27
 Second, because the Department's denial was not supported by substantial evidence, ... its action amounts to unreasonable discrimination.
 
 
 28
 Sprint I, 65 F.Supp.2d at 157 (internal quotation marks omitted); see 47 U.S.C. § 332(c)(7)(B)(iii) (governmental entity's denial of a request to place, construct, or modify personal wireless service facilities must be "in writing and supported by substantial evidence contained in a written record").
 
 
 29
 Further, the court found that DOE's withholding of approval on the ground that allowing a telecommunications company to install a cell site on school property invariably constitutes an impermissible use of public property solely for the benefit of a private party violated a TCA provision that states that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any state or local government or instrumentality thereof ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). The court stated that
 
 
 30
 defendant's position, if accepted, would bar telecommunications companies from installing facilities on any public school property and, contrary to explicit congressional policy, would frustrate rapid deployment of the new digital PCS technology.
 
 
 31
 Sprint I, 65 F.Supp.2d at 158.
 
 
 32
 Lastly, the court noted that the Act, in a section entitled "Removal of barriers to entry," provides that
 
 
 33
 [n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
 
 
 34
 47 U.S.C. § 253(a). Although subsection (b) of that section "permits states to adopt `competitively neutral' regulations `necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers,'" Sprint I, 65 F.Supp.2d at 159, the district court found that
 
 
 35
 [t]he Department ha[d] not presented any evidence showing that its decision protects the public safety and welfare, particularly in light of the fact that it has not shown that Sprint failed to comply with Office of Facilities Planning Regulations and construction requirements.
 
 
 36
 
 Id.
 
 
 
 37
 Accordingly, the district court "order[ed] the New York State Department of Education to issue the required permits allowing Sprint to install at the Ossining High School a telecommunications facility in the form of a flagpole." Id. at 161. DOE initially appealed; but it issued the building permit on or about October 1, 1999, and it shortly withdrew its appeal.
 
 
 38
 C. The Present Dispute as to Emissions Levels
 
 
 39
 On March 28, 2000, Sprint informed the School District that changes in available equipment required it to modify its original installation plan. One of the changes would increase the levels of radio frequency emissions ("RF Emissions") generated by the facility, although the levels nonetheless would remain in compliance with federal safety standards.
 
 
 40
 On July 5, 2000, when a Sprint construction crew attempted to begin work on the antenna, the School District barred the crew from access to the High School. Citing its concerns for the health and safety of the school's students, the School District took the position that it would not permit Sprint to install the facility unless Sprint agreed to operate the facility at or below the RF Emissions levels set out in the Lease Addendum.
 
 
 41
 Sprint pointed out to the School District that the RF Emissions levels stated in the Addendum are 13,000 times below the maximum levels set by the applicable federal safety standards. It also stated that in the period after the Lease Addendum was executed, technological advances had made Sprint's originally planned equipment obsolete. With the new technology, Sprint could not operate at the low RF Emissions levels outlined in the Addendum. Although Sprint guaranteed the School District that the new antenna would operate at levels below the maxima set by the federal safety standards, the School District insisted that it would not allow construction unless Sprint operated at or below the levels set forth in the Addendum.
 
 
 42
 Unable to resolve this conflict with the School District, Sprint returned to the district court. It filed a petition under the All Writs Act, 28 U.S.C. § 1651, for an order that would compel the School District to allow Sprint to install the antenna on the High School, asserting that the District's actions "frustrate the August 27, 1999 Order of this Court which permitted `Sprint to install at the Ossining High School a telecommunications facility in the form of a flagpole.'" (Petition for Expedited Relief Under the All Writs Act, dated August 1, 2000, at 9.)
 
 D. The Decision in Sprint II
 
 43
 In Sprint II, rendered in December 2000, the district court found that it had jurisdiction over the School District under the All Writs Act, and it granted Sprint's request for an injunction requiring the District to allow installation of the antenna. The court found that it was appropriate to exercise jurisdiction over the School District under the All Writs Act in light of Congress's intent "that the new wireless technology be disseminated nationally as rapidly as possible, ... that lawsuits arising under the TCA be resolved expeditiously and, most importantly, that local efforts to frustrate the implementation of this national policy be curtailed." Sprint II, 124 F.Supp.2d at 216.
 
 
 44
 Recounting the facts involved in Sprint I, the court stated that the present dispute between Sprint and the School District was part of a larger dispute involving Sprint and various state and local governmental officials and that the School District had known about the litigation at all times. The court noted that more than two years had passed since Sprint and the School District agreed on the Lease, and that the purpose of the August 1999 order in Sprint I had been to facilitate construction of the cell tower notwithstanding DOE's earlier refusal to issue the necessary permit and notwithstanding the "skittishness of parents and local officials about ad[a]pting to new technology, typified by concerns — almost to the point of superstition — about RF Emission levels." Sprint II, 124 F.Supp.2d at 216. The court concluded that exercise of ancillary jurisdiction under the All Writs Act was necessary in order to prevent opponents of the new technology from engaging in waves of litigation resulting in interminable delays and the frustration of Congressional policies underpinning the TCA.
 
 
 45
 As to the merits of Sprint's petition, the court held that the School District's refusal to allow Sprint to install the antenna equipment breached the terms of the Lease because the Lease expressly allowed Sprint to update its equipment:
 
 
 46
 The Lease committed Sprint to comply with all current FCC regulations pertaining to RF Emissions (paragraph 1b [sic: Lease Rider ¶ 16]). The October 21, 1998 Addendum committed Sprint to an RF level 13,000 [times] below federal standards, but only in regards to equipment "as originally installed." Sprint was also permitted under the Lease to make "such improvements on the site as it deems necessary from time to time for the operation of Sprint's system" (paragraph 7). These provisions, taken together, allow Sprint to install new equipment to recognize evolutions in technology so long as the new equipment complied with federal RF Emissions standards. Neither party disputes that the equipment Sprint proposes to install will comply with this standard.
 
 
 47
 Sprint II, 124 F.Supp.2d at 216-17.
 
 
 48
 The district court went on to hold that even if the Lease agreement required Sprint to operate its facility at RF Emissions levels 13,000 times below the federal maxima throughout the Lease term, such a requirement would be preempted by § 704 of the Telecommunications Act, which prohibits "state and local governments and municipalities from regulating the `placement, construction or modification' of wireless services on the bas[i]s o[f] the health [e]ffects of RF Emissions where the facilities would operate within the levels determined by the FCC to be safe." Sprint II, 124 F.Supp.2d at 217 (quoting 47 U.S.C. 332(c)(7)(B)(iv)). The School District argued that this section was inapplicable because in agreeing to the Lease, it was acting as a private property owner, rather than as a municipality in a regulatory capacity. The district court rejected this contention. It noted that the School District is an instrumentality of the state, citing City of New York v. State, 86 N.Y.2d 286, 631 N.Y.S.2d 553, 655 N.E.2d 649 (1995), and that the TCA does not "contain language supporting or implying a distinction between a local instrumentality acting in a regulatory capacity and a local government acting as a property owner." Sprint II, 124 F.Supp.2d at 217. Thus, given that "`regulate' means `to fix the time, amount, degree or rate of (as by adjusting, rectifying),'" id. (quoting Webster's Third New International Dictionary 1913, def. 3 (1976)), the court found it "clear that the District is undertaking to regulate RF emissions." Sprint II, 124 F.Supp.2d at 217.
 
 
 49
 The court held that the TCA preempted state and local governments from regulating the construction of personal wireless services on the basis of health concerns where the RF Emissions were within the safety levels determined by the FCC. The district court cited two Second Circuit cases, Cellular Phone Taskforce v. FCC, 205 F.3d 82, 88 (2d Cir.2000), cert. denied, 531 U.S. 1070, 121 S.Ct. 758, 148 L.Ed.2d 661 (2001), and Freeman v. Burlington Broadcasters, 204 F.3d 311, 320 (2d Cir.), cert. denied, 531 U.S. 917, 121 S.Ct. 276, 148 L.Ed.2d 201 (2000), for that proposition:
 
 
 50
 When the FCC established the Federal RF Safety Standard in 1996, it "announced, inter alia, a rule that prohibited state and local governments from regulating any personal wireless service facilities based upon perceived health risks posed by RF emissions as long as the facilities conformed to the FCC Guidelines regarding such emissions." Cellular Phone Taskforce, 205 F.3d at 88. When the Second Circuit examined the scope and pre-emptive effect of the Federal RF Safety Standard, it held:
 
 
 51
 the Act preempted state and local governments from regulating the placement, construction or modification of personal wireless service facilities on the basis of the health effects of RF radiation where the facilities would operate within the levels determined by the FCC to be safe. See 47 U.S.C. § 332(c)(7)(B)(iv). Id.
 
 
 52
 More recently, the Court considered regulatory preemption under the TCA in Freeman v. Burlington Broadcasters, 204 F.3d 311, 320 (2d Cir.2000), and held that the Federal RF Safety Standards totally pre-empt conflicting attempts to regulate RF emissions[.]
 
 
 53
 Sprint II, 124 F.Supp.2d at 217-18. The district court concluded that, because Sprint's facility would comply with the FCC's safety standards, the TCA preempted the School District's attempt to impose on Sprint more stringent standards, even by contract. The district court stated that "[w]hen private contractual provisions intrude upon matters regulated by Congress, they are not enforceable. Regardless of intent or convenience, private parties may not agree to alter statutory duties imposed by Congress." Id. at 219.
 
 
 54
 Having reached these conclusions, the district court permanently enjoined the School District
 
 
 55
 from seeking to require in any forum, except on direct appeal in this case, an order, finding, or judgment which would require [Sprint] to operate the facility which is the subject of the Petition, at any radio frequency emission level, except the level authorized by the federal Telecommunications Act of 1996,
 
 
 56
 Judgment and Order, filed January 9, 2001 ("2001 Injunction"), at 1-2, and to "take no action to impede, frustrate or interfere with the relief granted," id. at 2. The 2001 Injunction also ordered the School District to meet with Sprint "promptly ... to establish a timely schedule for the construction contemplated and approved by this Judgment and Order." Id.
 
 
 57
 The School District appealed. The 2001 Injunction has been stayed pending resolution of this appeal.
 
 II. DISCUSSION
 
 58
 On appeal, the School District contends principally that the district court erred (a) in exercising jurisdiction over the School District under the All Writs Act, (b) in holding that the District's attempt to enforce the Lease violated the Telecommunications Act, and (c) interpreting the Lease. We reject the School District's first contention, but find merit in the second and third.
 
 A. Jurisdiction Under the All Writs Act
 
 59
 The All Writs Act ("Writs Act") provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). This provision, while not conferring an independent basis of jurisdiction, "provides a tool courts need in cases over which jurisdiction is conferred by some other source," United States v. Tablie, 166 F.3d 505, 506-07 (2d Cir.1999), and in such cases the Writs Act "authorize[s] a federal court `to issue such commands ... as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained,'" Pennsylvania Bureau of Correction v. United States Marshals Service, 474 U.S. 34, 40, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985) (quoting United States v. New York Telephone Co., 434 U.S. 159, 172, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977)). The Writs Act is designed to provide a "source of procedural instruments designed to achieve the rational ends of law," id. at 172, 98 S.Ct. 364 (internal quotation marks omitted), when necessary in the federal court's "sound judgment to achieve the ends of justice entrusted to it," id. at 173, 98 S.Ct. 364 (internal quotation marks omitted). The Writs Act is to be applied "flexibly in conformity with these principles." Id. at 173, 98 S.Ct. 364.
 
 
 60
 The actions that a district court may take pursuant to the Writs Act include the assertion of jurisdiction "under appropriate circumstances, [over] persons who, though not parties to the original action or engaged in wrongdoing, are in a position to frustrate the implementation of a court order or the proper administration of justice." Association for Retarded Citizens of Connecticut, Inc. v. Thorne, 30 F.3d 367, 370 (2d Cir.1994) (internal quotation marks omitted), cert. denied, 513 U.S. 1079, 115 S.Ct. 727, 130 L.Ed.2d 631 (1995). Such jurisdiction may "encompass[] even those who have not taken any affirmative action to hinder justice." Id.
 
 
 61
 The court's exercise of ancillary jurisdiction under the Writs Act is reviewable under an abuse-of-discretion standard. See, e.g., United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, AFL-CIO, 266 F.3d 45, 49 (2d Cir.2001). In New York Telephone, for example, the Supreme Court held that, without any express grant of jurisdiction to the district court, that court had discretionary jurisdiction under the Writs Act to compel a telephone company to install pen registers needed by federal law enforcement agents to monitor certain of the company's telephone lines where there was probable cause to believe those lines were being used in an illegal gambling operation. The Supreme Court stated, "we do not think that the Company was a third party so far removed from the underlying controversy that its assistance could not be permissibly compelled." Id. at 174, 98 S.Ct. 364. The Court also noted that the Company's assistance was essential, that the Company was to be reimbursed at prevailing rates for assisting the agents, that the Company itself at times used pen registers, and that use of pen registers was far less intrusive than other surveillance methods Congress had authorized courts to approve.
 
 
 62
 In the present case too there was a sound basis for the district court's exercise of ancillary jurisdiction. The court indisputably had jurisdiction over Sprint's Telecommunications Act claims against DOE in Sprint I. The School District, though not a party to that action, was integrally involved because there would have been no controversy between Sprint and DOE if the District had not granted to Sprint the right to erect and maintain an antenna on the High School. The court had noted in Sprint I that federal law expresses a strong interest in establishing national wireless communications service "`for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communication,'" 65 F.Supp.2d at 155 (quoting 47 U.S.C. § 151); that "[t]he Act is designed to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technology and services to all Americans and by opening all telecommunications markets to competition," 65 F.Supp.2d at 160-61 (internal quotation marks omitted); and that the Act "mandate[s] that aggrieved parties be granted relief on an expedited basis," id. at 161. Having determined in Sprint I, in light of these federal policies, that DOE's actions impeding the School District's performance of its contractual obligations under the Lease violated the Telecommunications Act and should be promptly enjoined, the district court did not abuse its discretion in concluding that the swift exercise of ancillary jurisdiction over the School District — without whose entry into the Lease there would have been no Sprint I — was appropriate.
 
 
 63
 Accordingly, we turn to the merits of the district court's ruling that the School District's attempt to require Sprint to operate its facility at RF Emissions levels below the maxima set by federal standards is preempted by the Telecommunications Act.
 
 
 64
 B. The Telecommunications Act and Principles of Preemption
 
 
 65
 The foundation of preemption doctrines is "the Supremacy Clause, U.S. Const., Art. VI, cl. 2, [which] invalidates state laws that `interfere with, or are contrary to,' federal law." Hillsborough County v. Automated Medical Laboratories, Inc., 471 U.S. 707, 712, 105 S.Ct. 2371, 85 L.Ed.2d 714 (1985) (quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211, 6 L.Ed. 23 (1824)). Such preemption may be express or implied. Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field. See, e.g., Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); Association of International Automobile Manufacturers, Inc. v. Abrams, 84 F.3d 602, 607 (2d Cir.1996); Motor Vehicle Manufacturers Association of the United States, Inc. v. Abrams, 899 F.2d 1315, 1318 (2d Cir.1990), cert. denied, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991). Implied preemption occurs "either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively, ... or when state law is in actual conflict with federal law." Freightliner Corp. v. Myrick, 514 U.S. 280, 287, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995). The Supreme Court "ha[s] found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements,... or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Id. (internal quotation marks omitted).
 
 
 66
 A federal statute may preempt an area of regulation either in whole, see, e.g., Campbell v. Hussey, 368 U.S. 297, 300-02, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447, (1947), or in part, see, e.g., Michigan Canners & Freezers Ass'n v. Agricultural Marketing & Bargaining Board, 467 U.S. 461, 469, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984). "[I]f Congress has not displaced state regulation entirely, it may nonetheless pre-empt state law to the extent that the state law actually conflicts with federal law." Id. The inclusion in a federal statute of an express provision regarding preemption does not necessarily foreclose the possibility that aspects of a state law not expressly within the federal preemption provision may be preempted by implication. See, e.g., Freightliner Corp. v. Myrick, 514 U.S. at 287-89, 115 S.Ct. 1483 (discussing Cipollone v. Liggett Group, Inc., 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992)); Association of International Automobile Manufacturers, Inc. v. Abrams, 84 F.3d at 607. Thus, "a finding of implied preemption (which enlarges the field of preemption beyond what is covered by an express provision) is not automatically foreclosed by the existence of a preemption clause...." Toy Manufacturers of America, Inc. v. Blumenthal, 986 F.2d 615, 623 (2d Cir.1992) (emphasis in original); see generally Freightliner Corp. v. Myrick, 514 U.S. at 287-89, 115 S.Ct. 1483. However, where the federal statute contains "a provision explicitly addressing [preemption], and when that provision provides a reliable indicium of congressional intent with respect to state authority," preemption is restricted to the terms of that provision. Id. at 288, 115 S.Ct. 1483 (internal quotation marks omitted); see, e.g., Association of International Automobile Manufacturers, Inc. v. Abrams, 84 F.3d at 607; Vango Media, Inc. v. City of New York, 34 F.3d 68, 72 (2d Cir.1994); Toy Manufacturers of America, Inc. v. Blumenthal, 986 F.2d at 623. In Building & Construction Trades Council v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc., 507 U.S. 218, 224, 113 S.Ct. 1190, 122 L.Ed.2d 565 (1993) (commonly referred to as "Boston Harbor"), the Supreme Court reviewed the "settled pre-emption principles" and noted that when a federal statute does not contain an express preemption provision, we should not find [the local governmental entity's action] pre-empted "`"unless it conflicts with federal law or would frustrate the federal scheme, or unless [we] discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States."'" Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 747-748, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985) (citations omitted). We are reluctant to infer pre-emption. See Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992); Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).
 
 
 67
 Boston Harbor, 507 U.S. at 224, 113 S.Ct. 1190; see also Cipollone v. Liggett Group, Inc., 505 U.S. at 516, 112 S.Ct. 2608 (Congressional intent is the "ultimate touchstone" (internal quotation marks omitted)).
 
 
 68
 When federal law preempts state law, it prohibits a state or local governmental entity "from regulating within a protected zone, whether it be a zone protected and reserved for market freedom... or for [federal agency] jurisdiction." Boston Harbor, 507 U.S. at 226-27, 113 S.Ct. 1190. Federal regulation of interstate and foreign communications plainly preempts much of the field of wireless broadcasting. As we recently discussed in Freeman v. Burlington Broadcasters, Inc., 204 F.3d 311, 320 (2d Cir.) ("Freeman"), cert. denied, 531 U.S. 917, 121 S.Ct. 276, 148 L.Ed.2d 201 (2000), the Federal Communications Act ("FCA") was designed "to `centraliz[e] authority heretofore granted by law to several agencies' in the FCC, and to `grant[] additional authority with respect to interstate and foreign commerce in wire and radio communication' to the FCC." Freeman, 204 F.3d at 320 (quoting 47 U.S.C. § 151). In Freeman, which dealt solely with a local attempt to regulate radio transmission interference, we noted that the FCA empowered the FCC to, inter alia,
 
 
 69
 "[d]etermine the location of classes of stations or individual stations[,]" ... "[r]egulate the kind of apparatus to be used with respect to its external effects and the purity and sharpness of the emissions from each station and from the apparatus therein[,]" ... "[m]ake such regulations not inconsistent with law as it may deem necessary to prevent interference between stations and to carry out the provisions of this chapter[,]"... [and] "... establish areas or zones to be served by any station."
 
 
 70
 204 F.3d at 320 (quoting 47 U.S.C. § 303(d), (e), (f), and (h)). We found that "[t]hese statutory provisions make it clear that Congress intended the FCC to possess exclusive authority over technical matters related to radio broadcasting," and we concluded that "federal law has preempted the field of RF interference regulation." Freeman, 204 F.3d at 320.
 
 
 71
 With respect to wireless telephone communications, the Telecommunications Act, which is part of the FCA, has similarly given the FCC "broad," albeit "somewhat" more "circumscribed," preemption authority. Cellular Phone Taskforce v. FCC, 205 F.3d 82, 96 (2d Cir.2000), cert. denied, 531 U.S. 1070, 121 S.Ct. 758, 148 L.Ed.2d 661 (2001); see generally City of New York v. FCC, 486 U.S. 57, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988); Capital Cities Cable, Inc. v. Crisp, 467 U.S. 691, 698-700, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). To the extent pertinent here, the TCA section dealing with "[r]egulatory treatment of mobil services," 47 U.S.C. § 332(c), in its paragraph (7) entitled "Preservation of local zoning authority," id. § 332(c)(7), provides as follows:
 
 
 72
 (A) General authority
 
 
 73
 Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
 
 
 74
 (B) Limitations
 
 
 75
 (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof —
 
 
 76
 (I) shall not unreasonably discriminate among providers of functionally equivalent services; and
 
 
 77
 (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
 
 
 78
 ....
 
 
 79
 (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.
 
 
 80
 47 U.S.C. § 332(c)(7); see also id. §§ 337(c)(7)(B)(ii) and (iii) (requiring a governmental entity to act reasonably promptly on any request to place, construct, or modify personal wireless service facilities, and requiring that any denial of such a request be "in writing and supported by substantial evidence contained in a written record").
 
 
 81
 In Cellular Phone Taskforce, we dealt with, inter alia, the contention of various groups and individuals that state regulation of the operations of wireless service facilities with respect to their RF emissions levels was not preempted by FCC guidelines that, inter alia, set health and safety standards for "Maximum Permissible Exposure" to radio frequency radiation, see Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation, 11 F.C.C. Rcd. 15123, 1996 WL 926565 (1996) ("FCC Guidelines"). In rejecting the contention that state regulation was not preempted, we noted that § 332(c)(7)(B)(iv)
 
 
 82
 preempt[s] state and local governments from regulating the placement, construction or modification of personal wireless service facilities on the basis of the health effects of RF radiation where the facilities would operate within levels determined by the FCC to be safe.
 
 
 83
 Cellular Phone Taskforce, 205 F.3d at 88.
 
 
 84
 Not all actions by state or local government entities, however, constitute regulation, for such an entity, like a private person, may buy and sell or own and manage property in the marketplace.
 
 
 85
 A State does not regulate ... simply by acting within one of these protected areas. When a State owns and manages property, for example, it must interact with private participants in the marketplace. In so doing, the State is not subject to pre-emption by the [federal statute], because pre-emption doctrines apply only to state regulation.
 
 
 86
 Boston Harbor, 507 U.S. at 227, 113 S.Ct. 1190 (emphasis in original). Our decision in Cellular Phone Taskforce dealt with a generalized contention that, despite the FCC Guidelines, state regulation of RF emissions levels was permissible; it did not address the matter of whether a governmental entity or instrumentality could enforce a contractual provision dealing with such levels. In determining whether such local action constitutes forbidden regulation, or instead constitutes permissible proprietary action, we find the Supreme Court's decisions in Boston Harbor and Wisconsin Department of Industry, Labor and Human Relations v. Gould Inc., 475 U.S. 282, 286, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986) ("Gould"), both of which involved the preemptive reach of the National Labor Relations Act ("NLRA"), to be instructive.
 
 
 87
 In Gould, the Court dealt with a Wisconsin "debarment" statute that forbade state procurement agents, for a three-year period, to purchase products manufactured or sold by any entity that had been found, in judicially enforced orders of the National Labor Relations Board, to have violated the NLRA three times within five years. See 475 U.S. at 283-84, 106 S.Ct. 1057. Under this statute, "firms adjudged to have violated the NLRA three times [we]re automatically deprived of the opportunity to compete for the State's business." Id. at 287-88, 106 S.Ct. 1057. Noting that "on its face the debarment statute serves plainly as a means of enforcing the NLRA," id. at 287, 106 S.Ct. 1057, and "that the point of the statute is to deter labor law violations and to reward fidelity to the law," id. (internal quotation marks omitted), the Supreme Court held that the Wisconsin statute was preempted, see id. at 289-91, 106 S.Ct. 1057. The Court stated that the fact
 
 
 88
 [t]hat Wisconsin has chosen to use its spending power rather than its police power does not significantly lessen the inherent potential for conflict when two separate remedies are brought to bear on the same activity.... To uphold the Wisconsin penalty simply because it operates through state purchasing decisions therefore would make little sense. It is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern.
 
 
 89
 Id. at 289, 106 S.Ct. 1057 (internal quotation marks omitted).
 
 
 90
 Though noting a distinction between a state's acts performed as a regulator and those performed in a purely proprietary role, the Gould Court rejected Wisconsin's argument that, in adopting its procurement restrictions, the state was in fact acting not as a regulator but as a proprietor:
 
 
 91
 Wisconsin notes correctly that state action in the nature of "market participation" is not subject to the restrictions placed on state regulatory power by the Commerce Clause. See White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983); Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). We agree with the Court of Appeals, however, that by flatly prohibiting state purchases from repeat labor law violators Wisconsin "simply is not functioning as a private purchaser of services," 750 F.2d, at 614; for all practical purposes, Wisconsin's debarment scheme is tantamount to regulation.
 
 
 92
 Gould, 475 U.S. at 289, 106 S.Ct. 1057.
 
 
 93
 In Boston Harbor, the Court dealt with labor contract terms dictated by a Massachusetts agency ("MWRA") in connection with its task of cleaning up Boston Harbor following a federal court adjudication that the state had failed to prevent the pollution of the harbor. "The cleanup project was expected to cost $6.1 billion over 10 years.... The District Court required construction to proceed without interruption, making no allowance for delays from causes such as labor disputes." Boston Harbor, 507 U.S. at 221, 113 S.Ct. 1190. In order to carry out this project, the MWRA authorized its project manager to negotiate an agreement with the pertinent labor organization that would assure labor stability over the life of the project. The terms of the agreement ("Massachusetts Agreement") included use of specified methods for resolving all labor-related disputes; a requirement that all employees be subject to union-security provisions compelling them to become union members within seven days of their employment; the primary use of [the labor organization's] hiring halls to supply the project's craft labor force; a 10-year no-strike commitment; and a requirement that all contractors and subcontractors agree to be bound by the Agreement.
 
 
 94
 Boston Harbor, 507 U.S. at 221-22, 113 S.Ct. 1190. Bidders on contracts relating to the project were required to subscribe to these terms. The Massachusetts Agreement was challenged by a contractors' association and by nonunion employers on the ground, inter alia, that it was preempted by the NLRA. The Supreme Court disagreed.
 
 
 95
 In concluding that the Massachusetts Agreement was not preempted by the NLRA, the Boston Harbor Court emphasized the "conceptual distinction between regulator and purchaser," id. at 229, 113 S.Ct. 1190, and distinguished Gould on the bases that the Wisconsin statute addressed employer conduct unrelated to the employer's performance of its contractual obligations to the state and had no credible purpose other than enforcement of the NLRA, see Boston Harbor, 507 U.S. at 228-29, 113 S.Ct. 1190, whereas the Massachusetts Agreement, which had no relationship to labor performance on any job other than the harbor cleanup, was designed simply "to ensure an efficient project... would be completed as quickly and effectively as possible at the lowest cost," Boston Harbor, 507 U.S. at 232, 113 S.Ct. 1190. The Boston Harbor Court stated that Supreme Court
 
 
 96
 decisions in this area support the distinction between government as regulator and government as proprietor. We have held consistently that the NLRA was intended to supplant state labor regulation, not all legitimate state activity that affects labor.
 
 
 97
 Id. at 227, 113 S.Ct. 1190 (emphasis in original). It pointed out that in Gould, it had "emphasized that [it was] `not say[ing] that state purchasing decisions may never be influenced by labor considerations,'" Boston Harbor, 507 U.S. at 229, 113 S.Ct. 1190 (quoting Gould, 475 U.S. at 291, 106 S.Ct. 1057); but
 
 
 98
 [w]hen the State acts as regulator, it performs a role that is characteristically a governmental rather than a private role, boycotts notwithstanding. Moreover, as regulator of private conduct, the State is more powerful than private parties. These distinctions are far less significant when the State acts as a market participant with no interest in setting policy,
 
 
 99
 Boston Harbor, 507 U.S. at 229, 113 S.Ct. 1190. The Court stated that "a State may act without offending the pre-emption principles of the NLRA when it acts as a proprietor and its acts therefore are not tantamount to regulation or policymaking." Id. (internal quotation marks omitted). It concluded that
 
 
 100
 [t]o the extent that a private purchaser may choose a contractor based upon that contractor's willingness to enter into a prehire agreement, a public entity as purchaser should be permitted to do the same. Confronted with such a purchaser, those contractors who do not normally enter such agreements are faced with a choice. They may alter their usual mode of operation to secure the business opportunity at hand, or seek business from purchasers whose perceived needs do not include a project labor agreement. In the absence of any express or implied indication by Congress [in the NLRA] that a State may not manage its own property when it pursues its purely proprietary interests, and where analogous private conduct would be permitted, this Court will not infer such a restriction.
 
 
 101
 507 U.S. at 231-232, 113 S.Ct. 1190 (first emphasis in original; subsequent emphasis ours). See also Cardinal Towing & Auto Repair, Inc. v. City of Bedford, 180 F.3d 686, 693 (5th Cir.1999) (in order to determine, under Boston Harbor, whether "a class of government interactions with the market [is] so narrowly focused, and so in keeping with the ordinary behavior of private parties, that a regulatory impulse can be safely ruled out," a court must consider (1) whether "the challenged action essentially reflect[s] the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances," and (2) whether "the narrow scope of the challenged action defeat[s] an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem").
 
 
 102
 In the present case, these principles lead us to the conclusion that the School District's stance with respect to its Lease with Sprint is not preempted. First, we see nothing in the TCA to suggest that Congress meant to preempt a governmental entity's conduct that does not amount to regulation; and the structure and language of the TCA suggest precisely the contrary intent. To begin with, the structure of § 332(c)'s paragraph (7) indicates that Congress meant preemption to be narrow and preservation of local governmental rights to be broad, for subparagraph (A) states that "nothing" in the FCA is to "limit or affect" local governmental decisions "[e]xcept as provided in this paragraph." 47 U.S.C. § 332(c)(7)(A) (emphases added). Thus, unless a limitation is provided in § 332(c)(7), we must infer that Congress's intent to preempt did not extend so far.
 
 
 103
 Further, the language of paragraph (7) suggests that Congress did not mean to eliminate the distinction between acts that are regulatory and those that are proprietary, for the language in subparagraph (7)(A), preserving to local governmental entities authority except as limited in paragraph (7), refers broadly to governmental "decisions," whereas the prohibition set out in subparagraph (B)(iv) refers only to regulations. The latter states the limitation that, to the extent that a facility complies with FCC standards governing RF emissions, "[n]o State or local government or instrumentality thereof may regulate" facility construction, placement, or modification. 47 U.S.C. § 332(c)(7)(B)(iv) (emphasis added). The contrasting terms used in (A) and (B)(iv) reveal that the preemption provision with respect to RF emissions expressly provided by Congress in (B)(iv) carves out of subparagraph (A) only such decisions as constitute "regulat[ion]."
 
 
 104
 Thus, the language and structure of the TCA implicitly recognize that some governmental decisions are not regulatory and reveal that Congress meant "nothing" in the FCA to limit or affect the authority of a governmental entity "over decisions" as to the construction, placement, or modification of personal wireless service facilities on the basis of RF emissions "[e]xcept" to the extent that those decisions constitute "regulat[ion]."
 
 
 105
 Second, we view the actions of the School District in entering into the Lease agreement as plainly proprietary. There is no state or local statute or ordinance or guideline with respect to the RF Emissions levels at issue here. The School District entered into a single lease agreement with respect to a single building. The District did not purport to punish Sprint for any past conduct or to impose any condition with respect to any Sprint tower other than that to be located on the High School. Indeed, as originally negotiated, the Lease did not impose on Sprint any condition with respect to RF Emissions except to require that it supply an expert's certification "that the PCS will be in compliance will [sic] all current FCC regulations pertaining to radio frequency emissions." (Lease Rider ¶ 16.) We see in this record no basis for an inference that the School District sought to establish any general municipal policy.
 
 
 106
 Third, as Sprint has no right of eminent domain, a private individual, if approached by Sprint for permission to erect a cellular tower on his private property, would plainly have the right simply to refuse to enter into such a contract. The School District has the same right in its proprietary capacity as property owner to refuse to lease the High School roof for the construction of such a facility. Under Boston Harbor, such a refusal by the District would not have been preempted.
 
 
 107
 Further, a private party who has the right to refuse outright to lease his property also has the right to decline to lease the property except on agreed conditions (assuming those conditions would not violate law or public policy). Since, so far as we are aware, nothing in the law requires a communications company to operate at the FCC Guidelines maximum permissible radiation exposure levels, the private owner could elect not to grant a communications company a lease for the construction and operation of a cellular tower unless the company agreed to limit its RF emissions to a lower level. To the same extent, the School District as a public entity, sought out by the company only in the District's capacity as property owner, is permitted to do the same. And if the property owner, public or private, declines to enter into a lease without such a condition, the communications company is faced with a choice: the company may agree to the requested condition, or, if it is unwilling to do so, it may seek a lease elsewhere from a property owner who does not insist on such a condition. There is nothing in the conduct of the School District here that prevents Sprint from negotiating a lease on other property whose owner does not request conditions on emissions.
 
 
 108
 Finally, a lessee who agreed to the lease conditions requested by the owner of private property could not thereafter compel performance of the lease agreement by the private owner while the lessee refused to perform the agreed conditions. We see no indication that Congress meant the TCA to apply any different set of principles to a telecommunications company's negotiated agreement with a public property owner.
 
 
 109
 In sum, we conclude that the Telecommunications Act does not preempt nonregulatory decisions of a local governmental entity or instrumentality acting in its proprietary capacity; that the School District acted in a proprietary capacity, not a regulatory capacity, in entering into the Lease agreement with Sprint; that the conditions to which Sprint agreed at the request of the District are conditions that a private property owner would be free to demand; and that such a private owner would not be compelled to perform obligations imposed on him by the contract if the communications company refused to perform the conditions agreed to by it in the contract. Accordingly, the School District's attempt to enforce the RF Emissions provisions in the Lease agreement, as the District interprets those provisions, is not preempted by the Telecommunications Act.
 
 C. The Proper Interpretation of the Lease
 
 110
 Our conclusion that there is no preemption here does not end the inquiry, however, for we find the terms of the Lease, as amended by the Addendum, to be ambiguous. The Lease Addendum sets out the maximum RF Emissions levels to which the parties agreed, and it states that those levels are to apply "during the entire term of the agreement between Ossining Union Free School District and Sprint PCS." The Addendum also states, however, that "[t]he foregoing operating specification applies only to the Sprint Spectrum, L.P. antenna configuration, as originally installed." The proper reading of this combination of provisions — either by themselves or in the context of the entire Lease agreement — is hardly clear.
 
 
 111
 The district court found that the phrase "as originally installed," in conjunction with other language in the Lease allowing Sprint to make "improvements on the Site as it deems necessary from time to time" (Lease ¶ 7), permits "Sprint to install new equipment to recognize evolutions in technology so long as the new equipment complie[s] with federal RF Emissions standards." Sprint II, 124 F.Supp.2d at 216-217. While this is a reasonable reading, it is not the only permissible interpretation. The School District argues that the phrase "only to the Sprint Spectrum, L.P. antenna configuration, as originally installed" refers to the contingency that the school district might later wish to lease space at the High School to an additional cell phone service provider to erect an antenna, which would require higher overall RF Emission levels. Such a contingency was expressly provided for in the Lease (see, e.g., Lease Rider ¶¶ 14, 16), and the District presented, inter alia, affidavits of the Assistant Superintendent of Schools for Business and the former President of the District's Board of Education, along with letters and reports, to support this interpretation.
 
 
 112
 As the interpretation of ambiguous contract language in such circumstances is a question of fact to be resolved by the factfinder, see, e.g., Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Incorporated, 232 F.3d 153, 158 (2d Cir.2000), we conclude that the present controversy could not properly be decided on summary judgment and that the matter must be returned to the district court for trial as to the meaning of the Lease and Addendum.
 
 CONCLUSION
 
 113
 We have considered all of Sprint's arguments in support of the district court's rulings on the merits and have found them unpersuasive. The judgment of the district court is affirmed to the extent that the court exercised jurisdiction over the School District in this matter pursuant to the All Writs Act, and is reversed to the extent that it ruled that the Telecommunications Act preempts the School District from seeking enforcement of the terms of the Lease as interpreted by the District. The 2001 Injunction is vacated, and the matter is remanded for trial with respect to the contract interpretation issues.