RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0021p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

SUPERIOR COMMUNICATIONS, dba Smile FM,
　　　　　　　　　　　　　　*Plaintiff-Appellant,*

　　*v.*

CITY OF RIVERVIEW, MICHIGAN,
　　　　　　　　　　　　　　*Defendant-Appellee.*

No. 17-1234

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:15-cv-13363—Gerald E. Rosen, District Judge.

Argued:  December 7, 2017

Decided and Filed:  February 1, 2018

Before:  CLAY, GIBBONS, and COOK, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Cindy Rhodes Victor, KUS RYAN, PLLC, Auburn Hills, Michigan, for Appellant.
Lisa A. Anderson, JOHNSON, ROSATI, SCHULTZ & JOPPICH, P.C., Farmington Hills,
Michigan, for Appellee. **ON BRIEF:**  Cindy Rhodes Victor, KUS RYAN, PLLC, Auburn Hills,
Michigan, for Appellant.  Lisa A. Anderson, Michael E. Rosati, JOHNSON, ROSATI,
SCHULTZ & JOPPICH, P.C., Farmington Hills, Michigan, Randall A. Pentiuk PENTIUK,
COUVREUR & KOBILJAK, P.C., Wyandotte, Michigan, for Appellee.

_____

## OPINION

_____

　　JULIA SMITH GIBBONS, Circuit Judge.  This appeal concerns a dispute over whether
Superior Communications can significantly expand and upgrade its radio broadcast equipment

located on a telecommunications tower owned by the City of Riverview, Michigan. Though Superior alleges violations of the Telecommunications Act and of its constitutional rights, this case in fact turns on the interpretation of a straightforward licensing agreement between the parties. Because this agreement prohibits Superior from expanding its equipment without approval from the City, we affirm the district court.

I.

Superior Communications ("Superior"), doing business as Smile FM, is a nonprofit corporation that operates 21 radio broadcast stations throughout the State of Michigan. The City of Riverview (the "City") owns and operates a 320-foot telecommunications broadcast tower on City-owned property in Riverview, Michigan. Having received its permit from the FCC to operate a low-powered FM radio broadcast station, Superior entered into a "Telecommunication Site Access License Agreement" (the "License Agreement") with the City on October 20, 2010, to locate and operate certain radio broadcasting equipment on the City-owned telecommunications tower. Thereafter, and pursuant to the License Agreement, Superior installed one FMEC/1 single-bay antenna on the tower at a height of 300 feet and one 1,000-watt transmitter in the City's equipment shelter. The antenna and transmitter broadcasted a 700-watt station in accordance with Superior's original FCC permit and the License Agreement. The License Agreement placed strict limitations on future modifications to Superior's broadcast equipment and made future upgrades subject to the City's prior approval.

In April 2011, without the City's knowledge, Superior applied to the FCC for a modification to its FCC permit to allow for a significant increase in its broadcast power. In August 2012, the FCC issued Superior a permit to operate at 50,000 watts. In September 2012, Superior first approached the City regarding upgrading its equipment to allow it to broadcast at this increased power when Superior's President Ed Czelada e-mailed the City's Land Preserve Sales Manager John Menna that Superior "received permission from the FCC to replace [Superior's] antenna." DE 21-11, E-mails, Page ID 762. At the City's request, Superior then provided details of its proposed new equipment.

To aid in assessing Superior's request, the City hired Russell Harbaugh, an electrical engineer, to conduct an engineering evaluation of the proposed upgrade. He produced two reports (the "Harbaugh Reports"), which identified several issues to consider in determining whether to grant Superior's proposed equipment upgrade. The reports made clear that Superior's request to replace its single-bay antenna with a four-bay antenna would cause Superior's equipment to occupy thirty feet of space on the tower instead of its current three feet of space. They also expressed concern that the equipment upgrade would expose individuals around the tower to unsafe levels of radiofrequency electromagnetic radiation and that Superior's transmissions might create radio interference with other tower tenants.

Subsequently, on November 12, 2013, the City denied Superior's request to expand its broadcasting equipment located on the tower. Following this denial, Superior commissioned its own report attacking the Harbaugh Reports' conclusions, but in April 2015, the City reaffirmed its denial of Superior's request via a formal letter from the City Attorney. Superior then commenced this suit in state court, alleging that the City breached the License Agreement and violated Superior's due process and equal protection rights by denying Superior's request to upgrade its equipment. The City removed the case, and following this removal, Superior added an additional claim under the federal Telecommunications Act ("TCA"), 47 U.S.C. § 151 *et seq*.

The City moved for summary judgment on all grounds, which the district court granted. The district court concluded that the License Agreement was unambiguous and that it granted the City a contractual right to refuse Superior's requested upgrade, which the City had properly exercised. It also concluded that the City had not violated the Telecommunications Act, as the City had not enacted a "regulation" within the meaning of the Act but had instead acted in its proprietary capacity in denying Superior's request under the terms of the License Agreement. Finally, the court held that the City had a rational basis for its actions and, therefore, that Superior's constitutional claims were without merit.

We agree that Superior's claims are without merit and hold that the district court correctly granted summary judgment for the City.

II.

This court reviews a district court's grant of summary judgment *de novo*.  *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 469 (6th Cir. 2012) (citing *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006)).  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must "draw all reasonable inferences in favor of the nonmoving party."  *Int'l Union*, 434 F.3d at 483 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In doing so, this court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

A.

Superior first challenges the district court's grant of summary judgment for the City on Superior's claim for breach of the License Agreement.  We hold that the district court correctly concluded that Superior did not breach the unambiguous terms of the License Agreement.

1.

Superior first argues that the License Agreement was ambiguous and therefore that summary judgment was improper.

Because the License Agreement contains a choice-of-law clause designating it be construed in accordance with the laws of the State of Michigan and Superior's breach of license claim arises under state law, this court uses Michigan law to interpret the License Agreement. *See Johnson v. Ventra Grp., Inc.*, 191 F.3d 732, 738–39 (6th Cir. 1999); *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).  Under Michigan law, whether a contract is ambiguous is a question of law, which is reviewed *de novo* on appeal.  *Klapp v. United Ins. Grp. Agency, Inc.*, 663 N.W.2d 447, 451 (Mich. 2003) (citing *Farm Bureau Mut. Ins. Co. v. Nikkel*, 596 N.W.2d 915 (Mich. 1999)).  In interpreting the contract, a court must "honor the intent of the parties" by giving meaning to the agreement as written.  *Rasheed v. Chrysler Corp.*, 517 N.W.2d

19, 29 n.28 (Mich. 1994); *see Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 30–31 (Mich. 2005) (stressing unambiguous contract terms "must be *enforced as written*").  Thus, the contract should be read as a whole, "giving harmonious effect, if possible, to each word and phrase." *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 781 n.11 (Mich. 2003) (citing *Singer v. Goff*, 54 N.W.2d 290, 292 (Mich. 1952)).  If the contract's provisions "may reasonably be understood in different ways," the contract is ambiguous, and its interpretation is a question of fact for the jury.  *Universal Underwriters Ins. Co. v. Kneeland*, 628 N.W.2d 491, 494 (Mich. 2001) (citing *Farm Bureau*, 596 N.W.2d at 919); *Klapp*, 663 N.W.2d at 454.  If, however, the agreement is "clear and unambiguous, it is to be construed according to its plain sense and meaning" and summary judgment is appropriate.  *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 702 N.W.2d 106, 113 (Mich. 2005) (quoting *New Amsterdam Cas. Co. v. Sokolowski*, 132 N.W.2d 66, 68 (Mich. 1965)).  "[W]e will not create ambiguity where the terms of the contract are clear." *Id.*

Superior argues that various provisions of the License Agreement are in conflict, and therefore, the contract is ambiguous.  *See Klapp*, 663 N.W.2d at 453 ("[I]f two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous.").  Specifically, Superior contends that paragraphs 9(a), 11, and 16(a)(2) of the License Agreement supply conflicting information regarding Superior's ability to upgrade its equipment.  We find, however, that when read as a whole, with "harmonious effect, if possible," these provisions do not conflict.

> Paragraph 11 states, in relevant part:
>
> [Superior] may update or replace the Antennae Facilities from time to time with the prior written approval of [the City], provided that the replacement facilities are not greater in number or size or power output than the existing facilities and that any change in their location on the Tower is satisfactory to [the City]. [Superior] shall submit to [the City] a detailed proposal for any such replacement facilities and any supplemental materials as may be requested, for [the City's] evaluation and approval.

DE 18-2, License Agmt., Page ID 344.  Paragraph 9(a) provides that Superior "may erect and operate one FMEC/1 antenna and may expand but only with [the City's] consent and only after [obtaining] a certified evaluation indicating that each additional antenna will not interfere with

existing antennae . . . ." *Id.* at 343. And Paragraph 16(a)(2) states that the City "shall have the sole right" to "approve any changes to the size, type and quality of [Superior's] Equipment . . . , which approval shall not be unreasonably withheld . . . ." *Id.* at 345. Superior argues that the reservation "provided that the relevant facilities are not greater in number or size or power output" in Paragraph 11 "completely and totally prohibited any expansion" by Superior on the City's tower and, therefore, conflicts with paragraphs 9(a) and 16(a)(2), which provide that such upgrades would be allowed subject only to City approval. CA6 R. 28, Reply Br., at 14. We disagree.

Instead, Paragraph 9(a) confirms that Superior is authorized to erect and operate one FMEC/1 antenna and may *expand* the size or number of antennae only with the City's consent. Paragraph 11 notes that Superior may *update or replace* its equipment from time to time with City approval, but that this presumptive ability to update or replace does not apply "when the replacement facilities are greater in number, size, or power output than the existing facilities." Paragraph 16(a)(2) then describes the *procedure* for updating and replacing Superior's tower facilities, as allowed by Paragraph 11. Thus, when read together, Paragraphs 9(a), 11, and 16(a)(2) provide that the City can approve changes to Superior's equipment, but that it has no obligation to do so when a request would result in facilities that are "greater in number or size or power output than the existing facilities." The district court concluded as much, holding that "paragraph eleven qualifies Defendant's right of approval, and alerts Plaintiff that this requisite consent will not be forthcoming if Plaintiff's proposed replacement facilities are 'greater in number or size or power output than [its] existing facilities.'" DE 23, Order, Page ID 910 (citations omitted). In its quest for ambiguity, Superior makes a valiant effort to muddy provisions of the License Agreement that are consistent and straightforward: if Superior wishes to expand its equipment in the way it requested, it must have City approval.

Superior also points to extrinsic evidence, such as earlier drafts of the License Agreement and the City's course of conduct, to argue that the License Agreement gave it a right to upgrade its equipment. This extrinsic evidence, however, is wholly irrelevant to the question whether ambiguity exists in the License Agreement and could only be considered after finding that the contract *is* ambiguous. *Sheldon-Seatz, Inc., v. Coles*, 29 N.W.2d 832, 834–35 (Mich. 1947)

("This court does not have the right to . . . look to extrinsic testimony to determine [the parties'] intent when the words used by them are clear and unambiguous and have a definite meaning." (quoting *Mich. Chandelier Co. v. Morse*, 297 N.W. 64, 67 (Mich. 1941))); *see also UAW-GM Human Res. Ctr. v. KSL Recreation Corp.*, 579 N.W.2d 411, 414 (Mich. Ct. App. 1998) (quoting *Mich. Chandelier Co.* for the same principle).  Thus, because the License Agreement is unambiguous, this extrinsic evidence cannot be considered.  *See Sheldon-Seatz*, 29 N.W.2d at 834–35.  Further, even were we to find ambiguity in the License Agreement, analysis of this extrinsic evidence would still be inappropriate.  The proper remedy upon a finding of ambiguity would be to reverse the grant of summary judgment and remand the case to the district court so that a jury could determine the interpretation the language of this contract "in light of relevant extrinsic evidence"—not for the appellate court to interpret the contract in the first instance. *Klapp*, 663 N.W.2d at 450; *see also Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 422 (6th Cir. 2008) ("When a contract is ambiguous, it is for the jury to determine the meaning of its terms, subject to proper instructions . . . ." (quoting *Scott v. Anchor Motor Freight, Inc.*, 496 F.2d 276, 280 (6th Cir. 1974))).

In sum, the City acted within its unambiguous right to deny Superior's request to modify its equipment under the License Agreement.  Superior's proposed equipment modifications would have expanded the number of antennae (from one to four), would have occupied ten times more space on the City's tower (from three feet to thirty feet), and would have significantly increased Superior's broadcast power (from 700 watts to 50,000 watts).  Thus, the City had a contractual right under Paragraph 11 to deny this request.

2.

Superior next claims that the City waived its right to enforce the conditions of Paragraph 11 of the License Agreement because the City did not cite Paragraph 11 as a basis for denial. This argument is without merit and unsupported by the record.

To establish waiver under Michigan law, a party must show by clear and convincing evidence the mutual intention of the parties to waive or modify the original contract.  *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003).  And when,

as here, the contract includes an anti-waiver clause, the significance of this clause is "heightened where a party relies on a course of conduct to establish modification." *Id.*

Superior's claim that the City waived the provisions of Paragraph 11 through its course of conduct is unsupported by the record.  During discussions related to the upgrade, the City referred to the License Agreement and advised Superior that its proposed modifications would require written amendment to the License Agreement.  In their e-mail exchange, Menna and Czelada both referenced to the need for a License Agreement addendum prior to the proposed upgrades.  Moreover, the City's failure to cite the specific provision of the License Agreement under which it considered and then denied Superior's request does not indicate—much less show by clear and convincing evidence—an intent to waive Paragraph 11.  We agree with the district court that failure to specifically reference the specific license provision "shows nothing more than [the City's] knowing silence in the face of [Superior's] effort to upgrade its broadcast equipment beyond the parameters established in the License Agreement," and, therefore, no waiver occurred.  DE 23, Order, Page ID 917.

3.

Superior also points to a 2012 addendum to the License Agreement addressing the calculation of late payment fees to support its claim for breach of the License Agreement and waiver.  Indeed, much of Superior's Reply Brief is devoted to this topic.  Review of the record, however, reveals that this addendum primarily reconciled provisions of the License Agreement regarding late payment fees[1] and is unrelated to the dispute now before the court.  Contrary to Superior's assertion, the addendum did not "provide[] that appellant could install additional equipment on the Riverview tower." CA6 R. 20, Appellant Br., at 16, 37.  The only reference to additional equipment in the addendum was an addition to Paragraph 5(a) that "[a]dditional

---

[1]Superior claims that "the City's explanation of how the addendum to the License Agreement came to be lacks credibility, since nothing was changed in how the late payment charge was calculated." CA6 R. 28, Reply Br., at 13.  This assertion is patently untrue.  The addendum rewrote Paragraph 13 to state that "[l]ate payment charges shall be assessed in accordance with Paragraph 5, as amended." DE 21-10, License Addendum, Page ID 709.  In the unamended License Agreement, Paragraph 13 stated that the late payment charge would be fifty dollars per day, while Paragraph 5 provided for a 5% late payment charge.  Because these two provisions provided for two different late payment calculations, it is natural that the parties executed this addendum, and by rewriting Paragraph 13 the parties certainly changed how the late payment charge was calculated.

equipment is subject to the then effective monthly rent increase and is further subject to the annual escalation as stated in paragraph 5d hereunder. *All site equipment shall be negotiated with [the City].*" DE 21-10, License Addendum, Page ID 708 (emphasis added). Therefore, if anything, this addendum reaffirmed Superior's obligation to obtain City approval prior to equipment upgrades.

Moreover, this addendum was completed in June 2012—*before* Superior first approached the City regarding this equipment upgrade request in September 2012 and even *before* the FCC granted Superior's 50,000-watt permit in August 2012. At that time, the City did not even know that Superior had applied for the FCC permit to broadcast at 50,000 watts. Thus, Superior's claims of waiver and modification through the License Agreement addendum are without merit.

4.

Superior next claims that its upgrade request should have been deemed granted pursuant to the approval process outlined in Paragraph 16(a)(3) of the License Agreement and that the City breached the License Agreement by not following its dispute resolution provision. Both claims are meritless.

Paragraph 16(a)(3) provides an approval window for relocation of certain interfering "Equipment" and states that if the City has not approved or denied the proposed relocation within ten days, approval is deemed granted. The License Agreement, however, defines "Equipment" as Superior's original equipment, as defined in Schedule A. Thus, by its terms, Paragraph 16(a)(3) applies only to disputes between the City and Superior relating to the location of Superior's original equipment on the tower, not to the approval of any equipment upgrades or replacements. Therefore, Paragraph 16(a)(3) is irrelevant to the present dispute.

Second, the district court correctly dismissed Superior's claim that the City breached the dispute resolution provision of the License Agreement. The License Agreement provides that in any controversy arising out of the License, "[a] meeting will be held promptly between the parties to attempt in good faith to negotiate a resolution of the dispute." DE 18-2, License Agmt., Page ID 358. Superior claims that the City violated this obligation by failing to meet "promptly" at the request of Superior after its upgrade request was denied. Although Superior

claims a meeting was requested as early as February 11, 2015, as Superior acknowledges, the City did not formally deny its upgrade request until April 25, 2015. On June 17, 2015, Superior sent a letter to the City outlining its opposition to the denial and for the first time requesting a meeting. The parties' counsel then had a telephone conference sometime prior to July 16, 2015, to discuss the City Attorney letter. And then the parties met in person on August 21, 2015—only slightly over two months from the date a meeting was first requested and within the ambit of "prompt" in the realm of contractual disputes. Thus, the City did not breach the dispute resolution provisions of the License Agreement.[2]

Ironically, it appears that Superior is the party in breach of the dispute resolution provisions of the License Agreement. Prior to the parties' August 21 meeting, Superior had already filed this suit in Wayne County Circuit Court, even though the License Agreement provides that if the parties cannot resolve a dispute they will submit it "to a mutually acceptable third party mediator." DE 18-2, License Agmt., Page ID 358–59. The License Agreement also states that in any dispute no punitive damages will be awarded, each party will bear its own costs, and the parties waive their right to trial by jury. In its complaint, however, Superior made a jury trial demand and petitioned the court for injunctive relief, actual and punitive damages, and attorneys' fees. Thus, if anyone is in breach of the dispute resolution provisions of the License Agreement it is Superior—not the City.

For these reasons, the district court properly granted summary judgment for the City on Superior's claims for breach of the License Agreement.

---

[2]Moreover, even if there were such a breach, as the district court observed:

> [Superior] fails to suggest what relief would be appropriate to address [the City's] alleged breach of the "prompt meeting" obligation imposed on the parties under paragraph 45(b) of the License Agreement. . . . [T]he proper remedy presumably would be an order directing the parties to pursue to completion the dispute resolution process called for under their Agreement. Yet, [Superior] has requested no such relief; to the contrary, it abandoned this dispute resolution process by commencing this suit.

DE 23, Order, Page ID 920–21.

B.

Superior next asserts that the City violated 47 U.S.C. § 253(a) of the Telecommunications Act by denying Superior the ability to upgrade its equipment when its FCC construction permit would have permitted such an upgrade.  In response, the City argues that Superior cannot bring a private cause of action based a purported § 253(a) violation and, moreover, that there was no violation here because the City has not enacted a regulation within the meaning of the Act.  The district court granted the City's motion for summary judgment based on the absence of a regulation, without addressing the availability of a private cause of action.

We agree with the district court that the City did not take any action properly characterized as a "regulation" within the meaning of the Act.  We also hold that the plain text of § 253(d) indicates that there is no private cause of action available for a violation of § 253(a), and, therefore, Superior cannot assert this claim.[3]

1.

Superior alleges the City violated 47 U.S.C. § 253(a), which provides:

(a) In general

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

Sections 253 (b) and (c) then preserve the rights of state and local governments to impose necessary requirements to protect public safety, manage the public right-of-way, and establish

---

[3]In its reply brief, Superior attempts to recast its Telecommunications Act claim as one for violation of § 253(c), noting that it quoted *all* of § 253 in its appellant brief.  But the factual allegations and legal arguments Superior raises only support a potential § 253(a) claim.  In its argument Superior states that "47 U.S.C. § 253 expressly preempts any state law *which prohibits or has the effect of prohibiting telecommunication services*." CA6 R. 20, Appellant Br., at 42 (emphasis added).  This corresponds directly to the language of § 253(a), which provides that "[n]o state or local statute or regulation . . . *may prohibit or have the effect of prohibiting* the ability of any entity to provide any interstate or intrastate *telecommunications service*."  47 U.S.C. § 253(a) (emphasis added).  Nowhere does Superior allege that the City charged unreasonable or discriminatory rates, which would be required for a § 253(c) violation—indeed, its briefs do not discuss rates at all.  *See* 47 U.S.C. § 253(c).  Moreover, the district court concluded that Superior was asserting a violation of § 253(a).  For these reasons, we similarly conclude that Superior was only asserting a claim based on § 253(a).

rates on a competitively neutral and nondiscriminatory basis.    Importantly, § 253(d) then provides:

> (d) Preemption

> If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, *the Commission shall preempt the enforcement of such statute, regulation, or legal requirement* to the extent necessary to correct such violation or inconsistency.

47 U.S.C. § 253(d) (emphasis added).  This later subsection indicates that the proper remedy for a § 253(a) violation is preemption by the FCC, not initiation of a private cause of action by an aggrieved telecommunications operator.

This court has previously addressed the availability of a private cause of action under § 253 without deciding this precise question.    In *TCG Detroit v. City of Dearborn*, a telecommunications provider sued the City of Dearborn for setting unreasonable and discriminatory rates in alleged violation of § 253(a) and (c).  206 F.3d 618, 621–24 (6th Cir. 2000).  The court concluded that § 253(c) allowed for a private cause of action but did not reach a conclusion regarding the availability of a private cause of action under § 253(a).  *Id.* at 624; *see also Bristol Tenn. Essential Servs. v. United Tel. S.E., LLC*, No. 2:13-CV-267, 2015 WL 10096190, at *5 (E.D. Tenn. Sept. 30, 2015) (citing *TGC Detroit* and noting "[t]he Sixth Circuit has yet to decide whether § 253(a) confers a private right of action").  In this analysis, however, we made several points indicating that such a private cause of action would not be available under § 253(a).  *TCG Detroit*, 206 F.3d at 623–24.  First, we observed that the explicit reference to § 253(a) and (b) in § 253(d) could indicate that FCC preemption serves as the exclusive remedy for violations of those provisions.  *Id.* at 623.  Indeed, our conclusion regarding the availability of a § 253(c) private cause of action was solidified by § 253(c)'s *omission* from the FCC enforcement provision in § 253(d).  *Id.* at 624.  We also noted that another provision of the Telecommunications Act, 47 U.S.C. § 257, which "is devoted entirely to mandating FCC identification and review of 'entry barriers for entrepreneurs and other small businesses'" in telecommunications, "strengthen[s] the view that the FCC has exclusive jurisdiction over

violations of § 253(a)." *Id.* at 623 (quoting 47 U.S.C. § 257). This reasoning indicates skepticism toward the availability of a § 253(a) cause of action.

The majority of other circuits to address this question have concluded that § 253(a) does not grant a private right of action nor can a § 253(a) violation be brought as a § 1983 claim. *Spectra Commc'ns Grp., LLC v. City of Cameron*, 806 F.3d 1113, 1119–20 (8th Cir. 2015) (concluding that "the text of § 253 does not indicate that Congress intended to create a private right of action" and that "§ 253 does not authorize a private right of action for damages under § 1983"); *NextG Networks of NY, Inc. v. City of New York*, 513 F.3d 49, 53 (2d Cir. 2008) ("[Section] 253 does not create a private right of action for damages . . . ."); *Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571, 580–81 (9th Cir. 2008) (en banc) ("We adopt the reasoning and conclusion of the three-judge panel that 42 U.S.C. § 1983 claims cannot be brought for violations of 47 U.S.C. § 253." (citing *Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 490 F.3d 700, 716–18 (9th Cir. 2007))); *S.W. Bell Tel., LP v. City of Houston*, 529 F.3d 257, 261 (5th Cir. 2008) ("FTA § 253(a) does *not* create a private right enforceable under § 1983."); *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1266 (10th Cir. 2004) ("There is, therefore, no clear manifestation of congressional intent to create a federal right through § 253."); *BellSouth Telecomm., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1191 (11th Cir. 2001) (finding a private cause of action under § 253(c) but concluding that "[a]ll other challenges brought under § 253 must be addressed to the FCC"); *see also P.R. Tel. Co., Inc. v. Municipality Of Guayanilla*, 450 F.3d 9, 14–15 (1st Cir. 2006) (declining to address this "difficult question"); *N.J. Payphone Ass'n, Inc. v. Town of W. New York*, 299 F.3d 235, 241 (3d Cir. 2002) (same). In addition, at least one district court in this circuit has concluded, based on the statutory language and the reasoning in *TCG Detroit*, that § 253(a) does not confer a private cause of action. *Bristol Tenn. Essential Servs.*, No. 2:13-CV-267, 2015 WL 10096190, at *6 ("The language of § 253(d), coupled with its specific reference to § 253(a) and pointed omission of reference to § 253(c), compels the conclusion that Congress did not intend to create an implied private right of action for § 253(a); instead Congress intended for the FCC to enforce § 253(a), while telecommunications providers may enforce § 253(c).").

We conclude the same and hold that there is no private cause of action available under § 253(a).**4**

2.

Even were Superior able to pursue this action, its § 253(a) claim would nevertheless be without merit. The district court correctly concluded that there was no "regulation" here within the meaning of the Telecommunications Act and therefore that § 253 is inapplicable to the present dispute.

Section 253 states that no "local statute or regulation" or other "local legal requirement" shall prohibit the ability of any entity to "provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Superior claims that, by denying its upgrade request on the City-owned tower, the City violated this general prohibition because it "limit[ed] [Superior's] ability to broadcast within the parameters of its FCC licenses." CA6 R. 20, Appellant Br., at 42. The City's actions here, however, were pursuant to the negotiated License Agreement between it and Superior and cannot be properly characterized as a statute, regulation, or legal requirement within the meaning of § 253.

The Second Circuit in *Sprint Spectrum L.P. v. Mills*, 283 F.3d 404 (2d Cir. 2002), addressed a similar situation and came to the same conclusion. In *Sprint Spectrum*, a school district entered into a lease agreement with Sprint, permitting Sprint to build an antenna on a school rooftop, but the lease placed limitations on the level of radio emissions allowed. *Id.* at 407–08. Sprint later sought to modify the installation plan in a way that would have increased the level of radio emissions above the maximum authorized in the lease, though still within federal safety standards. *Id.* at 410–11. The school district refused to allow the upgrade, and Sprint sued, alleging preemption under the Telecommunications Act. *Id.* at 411. The Second Circuit concluded that the school district's actions did not amount to regulation because the

---

**4**In its reply brief, Superior also argues for the first time that this cause of action should regardless be permitted under the Supremacy Clause. Because this claim was not raised before the district court and on appeal was raised for the first time in Superior's reply brief, we do not address it. *See United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir. 1989) ("[C]ourt decisions have made it clear that the appellant cannot raise new issues in a reply brief; he can only respond to arguments raised for the first time in appellee's brief." (quoting 16 C. Wright, A. Miller, E. Cooper & E. Grossman, *Federal Practice and Procedure* § 3974 at 428 (1977))).

district, a local entity, "like a private person, may buy and sell or own and manage property in the marketplace." *Id.* at 417. It noted that the school district's action of entering into the lease agreement was "plainly proprietary" and therefore did not fall within the ambit of the Telecommunications Act. *Id.* at 420 ("[T]he language and structure of the TCA implicitly recognize that some governmental decisions are not regulatory . . . ."); *see also Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 201 (9th Cir. 2013) ("[T]he City's exercise of its property rights . . . here was non-regulatory and non-adjudicative behavior akin to an action by a private land owner."). Superior looks to *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311 (2d Cir. 2000), for support; however, that case involved a zoning board's attempt to regulate radio transmission interference—a clearly regulatory decision—and was distinguished in *Sprint Spectrum* on precisely that basis. *See id.* at 315; *Sprint Spectrum*, 283 F.3d at 416.

Here, the License Agreement between the City and Superior presents the same situation as *Sprint Spectrum*, and the reasoning from that case is persuasive. Just as private tower owners are not obliged to allow communications companies to operate at the FCC maximum transmissions levels—they may choose, via contract with a tenant, to limit equipment or broadcast power to a lower level—the City, in its capacity as a property owner, had the "right to decline to lease the property except on agreed conditions." *Sprint Spectrum*, 283 F.3d at 421. Superior sought out the City "only in [its] capacity as a property owner," and, as well put by the *Sprint Spectrum* court:

> [A] lessee who agreed to the lease conditions requested by the owner of private property could not thereafter compel performance of the lease agreement by the private owner while the lessee refused to perform the agreed conditions. We see no indication that Congress meant the TCA to apply any different set of principles to a telecommunications company's negotiated agreement with a public property owner.

*Id.* As such, the district court correctly granted summary judgment for the City on Superior's Telecommunications Act claims.

C.

Superior next alleges two constitutional challenges to the City's denial of its upgrade request, neither of which have merit.

1.

Superior first alleges a due process violation, claiming its requested equipment upgrade was a "legitimate claim of entitlement protected by due process" because the City had "limited discretion to deny" the request under the License Agreement.  CA6 R. 20, Appellant Br., at 49; *see Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972) (finding a property interest protected by due process when an individual has a "legitimate claim of entitlement" to a benefit). The district court held that Superior had not made a viable due process claim because the License Agreement squarely gave the City a right to deny approval for replacement facilities "greater in number or size or power output" than the existing facilities, meaning Superior had no protected property interest in the requested upgrade.  We agree with the district court that there was no protected property interest here.  More fundamentally, however, our precedent holds that that a procedural due process claim cannot be sustained in a situation where, as here, "the only difference between this case and any other garden-variety breach of contract case is that the City happened to be one of the contracting parties." *Kaminski v. Coulter*, 865 F.3d 339, 348 (6th Cir. 2017) (quoting *Taylor Acquisitions, L.L.C. v. City of Taylor*, 313 F. App'x 826, 832 (6th Cir. 2009)).

In *Kaminski v. Coulter*, this court, relying on *Ramsey v. Board of Education of Whitley County*, 844 F.2d 1268 (6th Cir. 1988), concluded that "a claim for a due-process violation does not lie where the thrust of the plaintiffs' argument is simply breach of contract." *Kaminski*, 865 F.3d at 348.  The court concluded that "[b]ecause a due-process claim is predicated on the deprivation of a constitutionally protected interest *without due process of law*, the availability of a state breach-of-contract remedy defeats the due-process claim." *Id.*  Here, Superior's purported property right is derived from the License Agreement and is therefore, at its core, simply a claim for breach of contract.  In its complaint Superior asserts that it has "property rights and liberty interests in the License Agreement, its place on the tower, and its right to upgrade its equipment

in order to maintain its business." DE 1, Not. of Removal, Page ID 17. And in its brief on appeal, Superior identifies the License Agreement as the source of its purported right, arguing that "the License Agreement provides that appellant may expand with the City's consent, and that such consent 'shall not be unreasonably withheld.'" CA6 R. 20, Appellant Br., at 48. Therefore, Superior has not made out a viable due-process claim. *See Ramsey*, 844 F.2d at 1273 ("A state breach of contract action is most clearly an adequate remedy for a property deprivation when the only basis for federal jurisdiction is that a state actor is one of the contracting parties.").

2.

Superior next argues that the City violated the Equal Protection Clause by denying its upgrade request while granting similar requests by other tower tenants, AT&T and T-Mobile.

The Equal Protection Clause prohibits discrimination by the government that "burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cty.*, 430 F.3d 783, 788 (6th Cir. 2005) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005)). Superior's claim is of the third kind—a "class-of-one" violation—and therefore the government action here is subject to rational basis review only. *See Taylor Acquisitions*, 313 F. App'x at 836–37.

As an initial matter, to state a class-of-one equal protection claim, a party must show that "the government treated similarly situated persons differently." *See Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 574 (6th Cir. 2008). The party bringing a claim "must allege that it and other individuals who were treated differently were similarly situated in all material respects." *Taylor Acquisitions*, 313 F. App'x at 836. Here, Superior has not done so. To support its claim of differing treatment, Superior points to the City permitting AT&T and T-Mobile to expand their equipment in ways that increased their number of antennae and power output; however, as the district court notes, we do not have the terms of AT&T's or T-Mobile's licensing agreements in evidence and therefore do not know whether their respective agreements included a provision that replacement facilities not be "greater in number or size or power output" than existing facilities.

Superior asks this court to "infer that the contract provisions that the City has with AT&T and T-Mobile are the same as the License Agreement with the appellant" because the License Agreement "is not a negotiated document," as shown by an earlier draft of Superior's License Agreement and Menna's deposition. CA6 R. 20, Appellant Br., at 53–54. Even if this court could engage in such baseless speculation, the record does not support this position. In the cited portion of Menna's deposition, Menna states that "some [license agreements] are different from this," meaning their standard form. DE 18-12, Menna Dep., Page ID 505. The earlier draft of Superior's License Agreement also reveals that there were several provisions that were significantly modified before the execution of the final version of the agreement. Most notably, the original draft of the License Agreement did not include the key language in Paragraph 11 that replacement facilities not be "greater in . . . power output than the existing facilities." DE 18-2, License Agmt., Page ID 344; DE 21-8, Original Draft License Agmt., Page ID 681–82. There is, therefore, no reason to believe that AT&T or T-Mobile would have such limitations in their respective licensing agreements. Thus, Superior has not shown that it is similarly situated to these tenants and therefore has not made a viable equal protection claim. *See Taylor Acquisitions*, 313 F. App'x at 836.

Moreover, the explicit terms of the License Agreement and the issues raised in the Harbaugh Reports, as outlined in Menna's November 2013 letter and the City Attorney's letter formally denying Superior's request, provide a "conceivable basis" for denial, and thus articulate a rational basis to justify any differential treatment. *See TriHealth, Inc.*, 430 F.3d at 788 ("A 'class of one' plaintiff may demonstrate that government action lacks a rational basis either by negativing every conceivable basis which might support the government action, or by showing that the challenged action was motivated by animus or ill-will."). Superior's equal protection claim, therefore, is without merit.

III.

For the reasons stated, we affirm the district court's grant of summary judgment for the City.