RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0094p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

AES-APEX EMPLOYER SERVICES, INC.; AES-APEX EMPLOYER SOLUTIONS, INC.,

>*Plaintiffs-Appellees* (17-2068),
>
>*Plaintiffs-Appellants* (17-2211),

*v.*

DINO ROTONDO; RICHARD MARK; UNITED STATES DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE,

>*Defendants-Appellees* (17-2068 & 17-2211),

AKOURI INVESTMENTS, LLC,

>*Intervenor-Appellant* (17-2068),
>
>*Intervenor-Appellee* (17-2211).

Nos. 17-2068/2211

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:13-cv-14519—Robert H. Cleland, District Judge.

Argued: May 8, 2019

Decided and Filed: May 17, 2019

Before: SUHRHEINRICH, THAPAR, and LARSEN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** H. Nathan Resnick, RESNICK LAW, P.C., Bloomfield Hills, Michigan, for Akouri Investments. Geoffrey J. Klimas, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for United States Department of the Treasury and Internal Revenue Service. Scott D. MacDonald, DIXON & MACDONALD, Southfield, Michigan, for AES-Apex. **ON BRIEF:** H. Nathan Resnick, RESNICK LAW, P.C., Bloomfield Hills, Michigan, for Akouri Investments. Geoffrey J. Klimas, Teresa E. McLaughlin, UNITED STATES DEPARTMENT

OF JUSTICE, Washington, D.C., for United States Department of the Treasury and Internal Revenue Service.  Scott D. MacDonald, DIXON & MACDONALD, Southfield, Michigan, for AES-Apex.

————————————

**OPINION**

————————————

THAPAR, Circuit Judge.  Dino Rotondo serves as a consultant for AES-Apex.  This case is a dispute about who gets the money that he makes consulting.  The IRS says that it should get the money because Rotondo is behind on his taxes.  Akouri Investments says *it* should get the money instead because Akouri loaned Rotondo money that he has not paid back yet.  And finally, AES-Apex says that *it* should get to keep some of the money pursuant to its contract with Rotondo.  The district court granted summary judgment in favor of the IRS, and we affirm.

I.

As relevant here, Dino Rotondo was the sole owner of Apex Administrative Services ("Apex").  Apex, in turn, wholly owned four limited liability companies:  Apex HR Services, LLC, Pinnacle HR Services, LLC, AS Holdings Group, LLC, and AS South, LLC (collectively, the "Directional Entities").  Together with these Directional Entities, Apex provided a variety of services, such as human resources, to different clients.

Eventually Rotondo opted to sell the Directional Entities' key asset—their customer lists, essentially lists of who their clients were.  He sold the customer lists in a deal with two firms, AES-Apex Solutions, Inc. and AES-Apex Employer Services, Inc. (collectively, "AES").  As part of that deal, AES agreed to pay Rotondo a share of its gross profits in the form of "Consulting Fees."

Yet the bad news for Rotondo is that he will not keep the Consulting Fees because he owes a lot of money and is behind on his payments.  Two entities have claims to collect Rotondo's Consulting Fees.  First, a firm named Akouri Investments, LLC ("Akouri") loaned

money to one of Rotondo's other companies.[1]  In return for that loan, Akouri gained a security interest in Apex's assets.  When Rotondo failed to pay back his loan, Akouri obtained a judgment against Rotondo and Apex for $1.4 million.

Second, Rotondo owes the IRS.  Over the years, Rotondo failed to pay his taxes, so the IRS has assessed various tax penalties against him.  As of 2015, Rotondo owed the IRS $3.4 million.  To try and get that money, the IRS filed several notices of tax liens against Rotondo, Apex, and the Directional Entities.

Once Rotondo started earning his Consulting Fees, both the IRS and Akouri saw an opportunity to get what they were owed.  The IRS contacted AES directly, claiming it was entitled to the Consulting Fees because of its tax liens.  Then, several months later, Akouri claimed that it was entitled to the Consulting Fees.  Facing conflicting claims to the Consulting Fees—and the possibility of having to pay twice—AES filed this interpleader action in state court.  Interpleader permits a party facing claims "that may expose [it] to double or multiple liability" to join all claimants as defendants in a single action.  Fed. R. Civ. P. 22(a)(1).  The IRS removed the case to federal district court, and the district court granted summary judgment in its favor.  The parties now appeal several of the district court's decisions.  We review each in turn.

II.

Before determining whether the IRS or Akouri gets the Consulting Fees, we must first figure out the size of the pot—i.e., how much money does AES owe Rotondo?  That turns on two sets of agreements between AES and Rotondo:  the Consulting Agreement and the Asset Purchase Agreement.[2]  AES claims that both of those agreements allow it to deduct the costs and attorneys' fees that it incurs in this case from what it owes Rotondo in Consulting Fees.  The district court disagreed and found instead that AES must pay the "full value" of those Consulting

---

[1]Another individual, Richard Mark, also loaned money to Rotondo's companies, but Mark's interest is not a subject of this appeal.

[2]AES and Rotondo signed two Consulting Agreements and two Asset Purchase Agreements that the parties treat as having substantially identical terms except for the AES signatory (either AES-Apex Solutions, Inc. or AES-Apex Employer Services, Inc.).  We refer to these agreements in the singular.

Fees.  This is a matter of contract interpretation that we review de novo.  *Royal Ins. Co. of Am. v. Orient Overseas Container Line Ltd.*, 525 F.3d 409, 421 (6th Cir. 2008).

A.

AES first claims that the Consulting Agreement allows it to deduct litigation expenses. In AES's Consulting Agreement with Rotondo, AES agreed to pay Rotondo a percentage of gross profits as Consulting Fees.  But the agreement permits it to deduct two types of costs from those gross profits:  the taxes that AES owes on its own profits and "direct expenses attributable to the employees leased under [a client's] account."  R. 1, Pg. ID 52.  AES claims that the costs of this litigation (including related state court actions) are such "direct expenses."  In interpreting the Consulting Agreement, we apply the "plain and ordinary meaning" of these terms.  *Rory v. Cont'l Ins. Co.*, 703 N.W.2d 23, 28 (Mich. 2005); *see also Stryker Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 842 F.3d 422, 426 (6th Cir. 2016) (applying Michigan law).

This "direct expenses" argument does not go very far.  Even assuming the meaning of the phrase "direct expenses" could include the costs of this litigation, we do not interpret contract language in isolation.  We must read "direct expenses" in context.  *See Mich. Twp. Participating Plan v. Pavolich*, 591 N.W.2d 325, 328 (Mich. Ct. App. 1998).  The full clause in the contract says that AES is only entitled to deduct "direct expenses *attributable* to the employees leased under [a client's] account."  R. 1, Pg. ID 52 (emphasis added).  "Attributable" essentially means "produced by."  *Oxford English Dictionary* (2012).  And the "employees leased" are AES's clients' employees.  Thus, the "direct expenses" clause covers expenses "produced by" the employees of one of AES's clients.  But neither AES's clients nor its clients' employees did anything to produce these litigation expenses.  None of AES's clients are parties to this litigation, and there is no suggestion that any of the clients' employees are bringing claims for Rotondo's Consulting Fees—only the IRS and Akouri are.  Indeed, AES's briefing does not even mention its clients' employees or point to any evidence that the costs of this litigation could be attributed to its clients' employees.  The litigation expenses from this case are not "attributable" to any of AES's employees at all—they are "attributable" to AES's lawyers, the IRS, and Akouri.  So, under the plain meaning of the Consulting Agreement, AES cannot deduct its litigation expenses from Rotondo's Consulting Fees.

AES counters by saying that the purpose of this provision was to enhance its profitability. Thus, anything that lowers its profitability should be deducted from the Consulting Fees. But such an expansive definition does not fit the language to which the parties agreed. Again, that language expressly limits AES's deductions to only two categories—not anything that could "significantly diminish[]" profit. 17-2068 Appellant Br. 20. We "honor the intent of the parties" by enforcing their agreement "as written"—not based on whatever vague purposes can be supplied after the fact. *Superior Commc'ns v. City of Riverview*, 881 F.3d 432, 438 (6th Cir. 2018) (quoting *Rasheed v. Chrysler Corp.*, 517 N.W.2d 19, 29 n.28 (Mich. 1998)). Accordingly, AES may not deduct costs or attorneys' fees on account of this provision.

B.

Next, AES contends that the Asset Purchase Agreement allows it to deduct litigation expenses. AES relies on two interwoven provisions in this Agreement: the Indemnification Provision and the Offset Provision. Our analysis again rests on the plain and ordinary meaning of these provisions. *Rory*, 703 N.W.2d at 28.

*Indemnification Provision.* This provision states that Rotondo and the Directional Entities must "indemnify" AES from the costs of litigation in a variety of circumstances, including "any claim, litigation or other action of any nature arising out of any act . . . prior to the date" the deal closed. R. 1, Pg. ID 19. The provision further requires Rotondo to indemnify AES for litigation expenses incurred in "enforc[ing] the indemnification obligations." *Id.* The Indemnification Provision may indeed encompass expenses incurred in this litigation since Rotondo owed taxes and did not pay his loan before the deal closed.

While Rotondo *may* owe AES money, it does not follow that AES can automatically deduct what it thinks Rotondo owes from the Consulting Fees. The Indemnification Provision does not create an automatic right for AES to be paid. Instead, this provision qualifies Rotondo's indemnification obligation by stating that Rotondo must pay *after* AES has made a "demand." *Id.* Without a demand, there is no right to payment under the contract. But there is no evidence that AES made such a demand—and thus no evidence that the Indemnification Provision has even been triggered.

*Offset Provision*. AES alternatively suggests that the last line of the Indemnification Provision, called the Offset Provision, proves that it has an automatic right to deduct costs and attorneys' fees. The Offset Provision states that AES "shall have a right to offset such losses, damages, liabilities, deficiencies, costs, expenses and attorneys' fees against any sums owed by [AES] to [Rotondo]." *Id.* AES thus argues that deducting costs and attorneys' fees from the Consulting Fees is merely executing this "right to offset."

AES's argument once again falls short because it failed to consider the *full* context of the Offset Provision. The Offset Provision only provides that an "offset" can occur for "*such* losses, damages, liabilities, deficiencies, costs, expenses and attorneys' fees." *Id.* (emphasis added). But does this mean that AES can offset automatically—and whenever it pleases—any losses caused by Rotondo against the fees owed him? What are "*such* . . . costs"? We can figure that out with the help of a canon of textual interpretation: a "demonstrative adjective generally refers to the nearest reasonable antecedent," i.e., when a word like "such" is used, it is normally referring to something mentioned previously. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 18 (2012); *Barnhart v. Thomas*, 540 U.S. 20, 27–28 (2003); *see also Sims's Lessee v. Irvine*, 3 U.S. (Dall.) 425, 444 n.* (1799) ("The rule is, that 'such' applies to the last antecedent, unless the sense of the passage requires a different construction.").

Applying this canon, we look to what came *before* the Offset Provision in the Asset Purchase Agreement. Immediately preceding the Offset Provision is a reference to costs incurred when "enforc[ing] the indemnification obligations." R. 1, Pg. ID 19. Perhaps "such" refers only to these enforcement costs. If that is the case, then AES is out of luck; no enforcement costs currently exist because AES has not sought to enforce Rotondo's indemnification obligations. But the text of the Offset Provision cuts against interpreting "such" as referring exclusively to costs incurred in enforcing the Indemnification Provision. The Offset Provision refers not merely to "such . . . costs, expenses and attorneys' fees"—losses that could be incurred trying to enforce the Indemnification Provision—but also "such . . . damages, liabilities, [and] deficiencies." It is hard to imagine how AES could incur the latter sort of losses—e.g., "damages"—by trying to enforce the Indemnification Provision. And the mention of "damages, liabilities, [and] deficiencies" in the Offset Provision likely refers back to

"damage[s], liabilit[ies] or deficienc[ies]" mentioned in the opening sentence of the Indemnification Provision. In other words, the Offset Provision is best read as referring to *both* the costs of enforcing the Indemnification Provision *and* the total costs that could be indemnified.[3]

But the broad coverage of the Offset Provision does not help AES here. Although the Offset Provision allows AES to offset any sums Rotondo is obligated to pay under the Indemnification Provision, Rotondo is not obligated to pay *anything* under that provision until AES has made a demand. Because there is no evidence in the record that AES has made such a demand, Rotondo is not currently obligated to pay under the Indemnification Provision. And there is thus no outstanding payment obligation to trigger the Offset Provision.

As there is no basis in either the Consulting Agreement or the provisions of the Asset Purchase Agreement for AES to deduct its costs and attorneys' fees from this litigation, we affirm the district court's contract interpretation. AES owes Rotondo the full amount of the Consulting Fees, without deductions.

III.

Although AES owes the full value of the Consulting Fees, Rotondo will not get to keep that money. Instead, the Consulting Fees will go to one of the two entities to whom he owes money: either Akouri or the IRS. Both have a claim to Rotondo's money. We must decide which one has seniority, i.e., who gets paid. The district court granted summary judgment in favor of the IRS. Akouri challenges this conclusion, and we review de novo. *1st Source Bank v. Wilson Bank & Tr.*, 735 F.3d 500, 502 (6th Cir. 2013).

Federal law controls the priority of a federal tax lien vis-à-vis other property interests. *United States v. Dishman Indep. Oil, Inc.*, 46 F.3d 523, 526 (6th Cir. 1995). And "priority for purposes of federal law is governed by the common-law principle that 'first in time is the first in right.'" *United States v. McDermott*, 507 U.S. 447, 449 (1993) (quoting *United States v. New Britain*, 347 U.S. 81, 85 (1954)). So it all comes down to timing: did the IRS's interest come

---

[3]It would also be strange if AES could offset losses from trying to enforce the indemnification provision but could not offset the losses Rotondo had to indemnify in the first place.

first, or did Akouri's?  We measure the timing of a federal tax lien by when the IRS gave notice of its lien.  26 U.S.C. § 6323(a), (f).  And we measure the timing of state security interests, like Akouri's, by when they become "choate"—i.e., complete or perfected.  *See United States v. Equitable Life Assurance Soc'y of the U.S.*, 384 U.S. 323, 328 (1966); *see also Black's Law Dictionary* (10th ed. 2014) (defining choate).  In general, these interests become "choate" as a result of a state judgment or state attachment filing ("when there is nothing more to be done").  *Blachy v. Butcher*, 221 F.3d 896, 905–06 (6th Cir. 2000).

The IRS was first.  The United States filed its notices of tax liens against Rotondo's assets between October 2007 and September 2013.  Akouri, in contrast, did not receive a state judgment against Rotondo until December 2013.  Thus, the IRS's liens have priority.

Akouri does not dispute this analysis.  Instead, Akouri tries to get around the IRS's clear priority in two ways.  Both are an attempt to recategorize the customer list assets as originally belonging to *Apex* rather than the Directional Entities.  If *Apex* really sold those customer lists to AES, then Akouri says it can take priority over the IRS because of its purportedly senior security interest in Apex.

First, Akouri claims Apex *actually* owned the customer lists that Rotondo sold to AES. In order to survive summary judgment on this theory, Akouri needed to first raise a genuine dispute of material fact as to the ownership of the customer lists.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  But Akouri has pointed to nothing in the record that disputes the pieces of evidence that tend to prove that the Directional Entities, not Apex, owned and then sold the customer lists to AES.  First, the Asset Purchase Agreement contains schedules detailing which customers' information was being sold.  These schedules list the owner of each customer's information, and only the Directional Entities are listed as owners.  Second, there are two examples of contracts that the Directional Entities proposed to a client to offer services. These "exemplar contracts" offer some proof that the Directional Entities were the companies working with the customers.  Third, Rotondo submitted an affidavit stating that the "customer assets . . . were owned by entities which were at no time subject to a lien . . . of Akouri."  R. 53-6, Pg. ID 1529.  Since Akouri did not have a lien on the Directional Entities, this too implies it was the Directional Entities that sold the customer lists.

While this may not be the strongest conceivable evidence, summary judgment is first and foremost about dispute resolution; facts must be disputed by the party, like Akouri, that opposes summary judgment. *See Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 378–79 (6th Cir. 2007) (holding that the party opposing summary judgment is required to point to evidence in the record that creates an issue of fact). Rather than dispute any of the IRS's evidence, Akouri has merely said that there is not enough evidence to conclusively say the Directional Entities owned the customer lists. We agree with the district court, however, that casting only "metaphysical doubt" is insufficient to survive summary judgment. *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).[4]

Akouri did, however, offer evidence that went to its second and altogether different theory of why Apex should be considered the owner of the customer lists. Even if the Directional Entities technically owned the customer lists, Akouri argues that they did not observe various corporate formalities separating them from Apex. Thus, according to Akouri, the Directional Entities are just sham companies—"alter egos" of Apex. As "alter egos," the Directional Entities would collapse back into one corporate form with Apex. And Akouri says it has a senior security interest in Apex.

But this theory fails as well. As mentioned, a security interest can only defeat an IRS tax lien if it is "choate." *Blachy*, 221 F.3d at 905–06. An interest is only "choate" if it does not require an additional judicial determination. *Cf. United States v. Vermont*, 377 U.S. 351, 355 (1964). It is one thing to casually describe the Directional Entities as "alter egos" of Apex, but it is another to consider them "alter egos" as a matter of law. For the Directional Entities to be legally considered "alter egos," a court would need to first make a judicial determination. *See, e.g.*, *In re Two Springs Membership Club*, 408 B.R. 453, 468–69 (Bankr. N.D. Ohio 2009), *reversed on other grounds by United States v. Camp Coast to Coast, Inc.*, 424 B.R. 251 (N.D. Ohio 2010). Thus, Akouri's interest under this theory remains inchoate because of the need for

---

[4]We also follow the district court in declining to decide if a Michigan state court decision has res judicata effect on this question. It is unclear whether the state court decided the ownership question. *New Hampshire v. Maine*, 532 U.S. 742, 748–49 (2001) (requiring "an issue of fact or law actually [be] litigated and resolved in a valid court determination").

an additional judicial determination.  And an "inchoate" interest cannot take priority over the IRS's tax lien.  *Cf. McDermott*, 507 U.S. at 449.

Moreover, even if a court were to now decide that the Directional Entities are sham companies, that determination would be too late.  An interest becomes "choate" at a specific point in time—the federal law of priority does not allow for interests to "relat[e] back" to an earlier time.  *Blachy*, 221 F.3d at 905.  Akouri's interest would be choate as of *2019*, not some earlier date.  But the IRS's tax liens indisputably date to well before 2019, so Akouri's interest would still not be "first in time."  *Id*.

Accordingly, we affirm summary judgment in favor of the IRS.

IV.

Akouri appeals two additional decisions by the district court.  First, the district court denied Akouri's motion for supplemental briefing, which included a request that the court consider new evidence on the ownership of the customer lists.  Second, the district court declined to exercise supplemental jurisdiction over Akouri's additional state law fraudulent transfer claim.  Akouri concedes that we can only reverse these decisions if they were an abuse of discretion.  *Jones v. Northcoast Behavioral Healthcare Sys.*, 84 F. App'x 597, 599 (6th Cir. 2003) (citing *In re Air Crash Disaster*, 86 F.3d 498, 516 (6th Cir. 1996)) (supplemental briefing); *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 200 (6th Cir. 2004) (supplemental jurisdiction).

*Supplemental Briefing*.  After the magistrate judge finished his report and recommendation—and nearly three months after briefing concerning that report and recommendation had been completed—Akouri sought permission to file a supplemental brief with new evidence attached.  This evidence came from new depositions that Akouri took in a state court action involving Rotondo and AES.  Akouri says that the district court should have considered this evidence.  Docket control, however, is something that rests in the "sound discretion of the district court."  *In re Air Crash Disaster*, 86 F.3d at 516 (alteration omitted).  And the district court pointed out that Akouri had the opportunity to request these depositions during federal discovery but did not.  Had it sought these depositions, it then could have used them to develop additional arguments and included them in the various summary judgment

motions. Further, to the extent that this evidence would lead to new legal arguments, the district court explained Akouri had forfeited those arguments. *See Murr v. United States*, 200 F.3d 895, 902 n.1 (6th Cir. 2000). Such reasoning was not an abuse of discretion.

Akouri argues otherwise. Akouri says the district court would have denied an earlier request for discovery as duplicative of its state court discovery. Therefore, it would have been fruitless to ask. But we cannot know what the district court would have done if given the opportunity to review Akouri's request for evidence earlier. All we know is there was nothing barring Akouri from making a good faith request for discovery during the time allotted by the parties, the magistrate judge, and the district court. Akouri made a strategic decision not to make that request. And when it finally got the depositions and sought to introduce them, the district court reasonably explained why it was too late. *Cf. Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936) (stating that a court has inherent power "to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants").

In one last argument, Akouri points to an unpublished decision, *Muhammad v. Close*. No. 08–1944, 2009 WL 8755520, at *2 (6th Cir. Apr. 20, 2009) (order). But *Muhammad* did nothing more than recognize the age-old truth that district courts must actually use the discretion that they have. *Id.* (remanding because district court did not appear to use its discretion in deciding whether to accept late evidence); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, the district court did so in its reasoned discussion of Akouri's request. It simply exercised that discretion in a way contrary to what Akouri wanted. Indeed, a district court never abuses its discretion when it holds that an issue not actually presented to a magistrate judge is forfeited. *See United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998) (citing *Marshall v. Chater*, 75 F.3d 1421, 1426–27 (10th Cir. 1996) (collecting cases holding that issues raised for the first time in objections to a magistrate judge's report are deemed forfeited)). And *Muhammad* did not create a different rule (nor could it). Accordingly, *Muhammad* neither calls into question the discretion that the district court used here nor alters the district court's forfeiture analysis.

*Supplemental Jurisdiction.* As part of its cross-complaint below, Akouri alleged that the sale of the customer lists from the Directional Entities to AES was a fraudulent conveyance under Michigan law. The district court dismissed this claim after it granted summary judgment

in favor of the IRS. Akouri's dispute with the IRS was the basis of the court's jurisdiction; Akouri's Michigan-law claim merely tagged along based on supplemental jurisdiction. This dismissal was not an abuse of discretion. "[I]n the usual case in which all federal-law claims are eliminated before trial," district courts should decline to "exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 & n.7 (1988).

Akouri claims this is not a usual case. It points out that three years had passed since it filed its state law claim. Therefore, Akouri argues, it was imprudent for the district court to dismiss the state law claim since the litigation was no longer in its "early stages." *Id*. at 350. But the progression of litigation is not measured so much in years as in the various and familiar stages laid out in the Federal Rules of Civil Procedure—there is the filing of the complaint, notice, answers to the complaint or motions to dismiss, discovery, motions for summary judgment, trial, and final judgment. *See, e.g.*, Fed. R. Civ. P. 3, 4, 12, 26, 40, 54, 56. So the proper metric is how far Akouri's state law claim was along *these* stages. The answer? Not far. Akouri points to no discovery undertaken for this claim, and the docket discloses no motions for summary judgment on this claim either. Indeed, Akouri concedes that it instead sought most of its discovery on these issues in the parallel *state* case. Thus, in terms of the stages of litigation and the resources to be expended on it, Akouri's state law claim was in its very early stages indeed. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559–60 & n.6 (2007) (discussing the burdens and resource intensive nature of the discovery stage of litigation). The district court did not abuse its discretion by declining to exercise supplemental jurisdiction over Akouri's state law claim.

\*     \*     \*

The district court properly interpreted the agreements between AES and Rotondo, properly granted summary judgment in favor of the IRS's claim for the Consulting Fees, and did not abuse its discretion in denying Akouri's requests for supplemental briefing and supplemental jurisdiction.

We affirm.